QUANTUM OVERSEAS, N.V., Plaintiff,

v.

TOUCHE ROSS & CO., Robert H. Power, John Boreta, Thomas P. O'Boyle, Kermit Roosevelt, and Thomas M. Tryon, Defendants.

Moise KATZ, Plaintiff,

v.

TOUCHE ROSS & CO., Robert H. Power, John Boreta, Thomas P. O'Boyle, Kermit Roosevelt, and Thomas M. Tryon, Defendants.

Nos. 86 Civ. 4059 (RWS), 86 Civ. 4460 (RWS).

United States District Court, S.D. New York.

June 22, 1987.

659

Abbey & Ellis, New York City, for plaintiff Quantum Overseas, N.V.; Ralph L. Ellis, of counsel.

Shea & Gould, New York City, for defendant Touche Ross & Co.; Richard L. Spinogatti, Joel S. Farley, of counsel.

Proskauer Rose Goetz & Mendelsohn, New York City, for defendants Robert H. Power, John Boreta, Thomas P. O'Boyle, Kermit Roosevelt, and Thomas M. Tryon; Bruce E. Fader, Michael A. Cardozo, Roselyn S. Sands, William M. Vazquez, of counsel.

Goodkind, Wechsler, Labaton & Rudoff, New York City, for plaintiff Moise Katz; Joseph Sternberg, of counsel.

## OPINION

SWEET, District Judge.

In these related actions brought under § 11 of the Securities Act of 1933 and § 10(b) of the Securities Exchange Act of 1934, defendants Touche Ross & Co. ("Touche Ross"), Robert H. Power, John Boreta, Thomas P. O'Boyle, Kermit Roosevelt, and Thomas M. Tryon have moved to dismiss the complaints. In *Quantum Overseas, N.V. v. Touche Ross & Co.*, 663 F.Supp. 658 (S.D.N.Y.1987), the defendants have moved to dismiss the action as time-barred under Rule 12(b)(6), Fed.R.Civ.P., or Rule 56, Fed.R.Civ.P. or, in the alternative, to transfer it to the Southern District of Texas. In *Katz v. Touche Ross & Co.*, 86 Civ. 4460, the defendants have moved to dismiss the complaint for failure to plead fraud with particularity or, in the alternative, to transfer the action to the Southern District of Texas. For the reasons discussed below, the motion to dismiss the complaint in *Quantum Overseas* is granted in part and denied in part, and the motion to dismiss the complaint in *Katz* is granted.

### I. *The Quantum Overseas Complaint*

On May 21, 1986, plaintiff Quantum commenced an action in this court, asserting claims under §§ 11 and 15 of the Securities Act of 1933 in connection with its purchases of 16½% Senior Subordinated Debentures due 1994 (the "16½% Debentures") issued by Buttes Gas & Oil Co. ("Buttes") pursuant to a prospectus dated September 14, 1984 (the "Prospectus"). Named as defendants were Touche Ross, Buttes' public accountant, and the directors of Buttes. Buttes is not a party to this action because it has filed for protection under Chapter 11 of the Bankruptcy Code.

Quantum purchased the 16½% Debentures in a face amount of $24,472,000 at a cost of approximately $13,265,000 in twelve separate trades commencing on April 16, 1985 and ending on June 26, 1985, at prices ranging from $66.50 (or $665 per $1,000 face amount debenture) on April 16, 1985 to $37.70 (or $377 per $1,000 face amount debenture) on June 26, 1985.[1]

The original complaint alleged that the Prospectus was misleading in that defendants failed to disclose, *inter alia*, that (i) the contract drilling equipment owned by Buttes was worth substantially less than the value at which it was being carried on the books of Buttes; (ii) the contract drilling equipment should have been written down to market value in a timely manner; and that (iii) almost all of Buttes' offshore drilling rigs were virtually idle. The amended complaint, filed September 2, 1986, added the claims that the agricultural properties owned by Buttes were overvalued and should have been written down; and that as to certain agricultural properties, Buttes owned a minority interest and, thus, had no control over the management or disposition of said properties.

The complaint sets forth the decline of Buttes' contract drilling business, following, as it did, the general decline in the oil industry. Thus, the complaint quotes the Buttes' September, 1984 Prospectus as disclosing that:

A significant decline in drilling activity, particularly in the United States, began in 1982 and continued until the fourth quarter of 1983 when activity started to increase.... Primarily as a result of the addition of the new rigs and the general decline in drilling activity, there is currently a worldwide oversupply of various types of offshore rigs.

Buttes also indicated that the weakness and uncertainty surrounding oil and gas

---

1. A final trade in which Quantum purchased ten debentures at a price of $14 (or $140 per $1,000 face amount debenture) was made on December 20, 1985.

prices contributed to a weakening in the demand for its own offshore rigs in 1983 as compared to prior years.

The complaint also alleges that in an appraisal of Buttes as of December 31, 1982 contained in John S. Herold, Inc., Oil Industry Comparative Appraisals (the "Herold Report"), the contract drilling equipment (consisting of the same 20 rigs held by Buttes as of December 31, 1983) was appraised at $101 million, as compared to the value of $218,840,000 on the December 31, 1982 financials and the value of $225,-460,000 on the December 31, 1983 financials.

On April 14, 1985, Touche Ross issued a going concern qualification with respect to Buttes' December 31, 1984 financial statements. This note to Buttes' 1984 financial statements was filed with the SEC on April 15, 1985 and provides in pertinent part:

### Note B. GOING CONCERN CONSIDERATIONS

The Company has incurred losses of $28,979,000 and $3,457,000 in 1984 and 1983.... The general decline in drilling activity and worldwide oversupply of rigs caused downward price pressure on drilling rig day rates and lower rig utilization.

The Company expects the effects of lower rig utilization and day rates on rigs in service to continue to cause operating losses in this segment through 1985. Oil and gas prices have decreased as a result of the worldwide excess supply of crude oil and natural gas prices in the immediate future. A prolonged or worsening of such factors, absent favorable offsetting developments, will have a material and adverse effect upon the Company.

The Company's operations will not provide sufficient liquidity without certain sales of assets, additional borrowings or restructuring of presently existing debt retirement schedules to meet its obligations as they become due.... the realization of the Company's assets is dependent on future events, the outcome of which cannot presently be determined.

The ability of the Company to continue in existence is dependent on achieving profitable operations from the contract drilling and workover segment in the future and a restructuring of existing debt retirement schedules. The financial statements have been prepared on the basis of accounting principles applicable to a going concern and *do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the classification of liabilities that might be necessary should the Company be unable to continue in existence* (emphasis added).

Two days after the issuance of this opinion, on April 16, 1985, Quantum began buying Buttes' 16½% Debentures.

On August 26, 1985, Buttes announced a proposed restructuring plan under which "a substantial shrinkage of the consolidated balance sheet ... was planned." Further, the announcement disclosed that "potentially all of the [contract drilling] rigs could be disposed of" and that "such disposition was expected to result in a material writedown of the book value with respect to such rigs...." That August 29 announcement also stated that "[u]nder the Company's restructuring plan, other assets, principally in the minerals and agricultural areas, would be disposed of. The timing and magnitude of such asset writedowns are to a large extent outside the control of the Company."

Seven months after the issuance of Touche Ross' qualified opinion, on November 15, 1985, Buttes filed for protection under the bankruptcy laws in Houston. After the bankruptcy filing, on December 5, 1985, Buttes announced writedowns in five asset groups, by far the largest of which was the contract drilling equipment ($160,955,000); agricultural properties were written down by $17,316,000.

A. *Compliance with the One-Year Limitations Period: The Drilling Equipment*

Quantum contends that Buttes' December 31, 1983 financial statements, which appeared in the September, 1984 Prospectus, carried its contract drilling equipment and agricultural properties at overstated

values in violation of Generally Accepted Auditing Standards and Generally Accepted Accounting Principles. Although that Prospectus was issued in September, 1984, Quantum did not commence this action until May 21, 1986.

Section 13 of the 1933 Act, 15 U.S.C. § 77m, bars actions:

> unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.

15 U.S.C. § 77m.

A plaintiff suing under § 11 of the 1933 Act must allege compliance with § 13 as part of its cause of action. *See e.g.*, *Bresson v. Thomson McKinnon Securities, Inc.*, 641 F.Supp. 338 (S.D.N.Y.1986); *Intre Sport, Ltd. v. Kidder, Peabody & Co.*, 625 F.Supp. 1303, 1310 (S.D.N.Y.1985). To satisfy the plaintiff's burden under § 13, the complaint must set forth:

> (1) the time and circumstances of the discovery of the fraudulent statement; (2) the reasons why it was not discovered earlier (if more than one year has lapsed); and (3) the diligent efforts which plaintiff undertook in making or seeking such discovery.

*Krome v. Merrill Lynch & Co.*, 637 F.Supp. 910, 914 (S.D.N.Y.1986), *vacated in part*, 110 F.R.D. 693 (S.D.N.Y.1986); *see Homburger v. Venture Minerals, Inc.*, [1982 Transfer Binder], Fed.Sec.L.Rep. (CCH) ¶ 98,858 at 94,426–27 (S.D.N.Y. Nov. 3, 1982) [Available on WESTLAW, DCT database].

■ Quantum's complaint meets only the first of the three pleading requirements. It alleges that:

> Plaintiff discovered the falsity of these statements for the first time on or about December 5, 1985 when Buttes filed its Form 10–Q for the period ended September 30, 1985 announcing the massive writedowns of the contract drilling and other equipment.

However, because Quantum did not sue until more than a year after the alleged false statements and omissions in the September, 1984 Prospectus, it must allege: (1) the reason it did not discover the alleged misrepresentations and omissions earlier; and (2) the diligent efforts it undertook to do so. The complaint fails to discharge either burden and therefore fails to state a claim upon which relief can be granted. Therefore, the complaint is dismissed.

The defendants urge that dismissal of the complaint should be without leave to replead, since the facts alleged in the complaint and the affidavits submitted by Quantum in opposition to this motion establish that Quantum cannot meet its burden under the one-year limitations period with respect to its principal claim. First of all, the defendants contend that the disclosure of the deteriorating condition of the drilling market, the deep discount at which the bonds were purchased, and Touche Ross' going concern qualification triggered Quantum's duty to inquire into the alleged overstatement of asset values more than a year before it sued. Second, the defendants argue that Quantum actually knew of the fact of the "overstatement" before May 21, 1985, one year before the complaint was filed, and failed to bring suit "within one year of the discovery of the untrue statement or the omission," as required by § 13, 15 U.S.C. § 77m.

Whether or not Quantum was on inquiry notice of any "overstatement" by virtue of the discount at which it bought the debentures and other disclosures in Buttes' SEC filings, the defendants' second claim, that Quantum actually knew of the overstatement, is dispositive of the issue on this record.[2]

---

**2.** Because the court is relying on factual allegations outside the complaint, this issue will be treated as a motion for summary judgment. Of course, summary judgment may not be granted if there is a genuine issue as to any material fact, that is, if the evidence is such that a reasonable jury could return a verdict for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The standard mirrors that for a directed verdict under Fed.R.Civ.P. 50(a), which instructs the trial judge to direct a verdict if but one reasonable conclusion as to the verdict can

■ Quantum concedes in an opposing affidavit that it knew more than one year before it brought suit and shortly before its purchase of the debentures that the contract drilling equipment was appraised at substantially less than the value set forth in the 1983 financial statements contained in the September, 1984 Prospectus. Quantum admits that before it bought any debentures in April, 1985, it (1) examined the value at which Buttes' drilling rigs were being carried, (2) studied the appraisals of Buttes' drilling rigs published in the Herold Report, which appraised the equipment at approximately 54% of the carrying value set forth in the Prospectus, and (3) because it was "aware of the general downturn in the oil industry and [Buttes'] experience in the drilling rig segment of its business, ... made certain adjustments in [its] analysis" of the market value of the equipment. Thus, Quantum knew that the 1983 financial statements in the September, 1984 Prospectus had "overstated" the drilling equipment's current value. Its present claim, therefore, must rest on the proposition that Buttes had to disclose sufficient information to put Quantum on notice of the *extent* of the overstatement. Without such disclosure, the argument goes, Quantum could not have discovered before May 21, 1985 the extent or magnitude of the alleged overstatement concerning the drilling equipment.

The issue before the court, then, is whether Quantum was required to bring suit within one year of its discovery that the Prospectus contained the alleged misstatements, even though it did not know the extent of those misstatements.

There is substantial authority in this Circuit and others that the one-year limitations period commenced to run once Quantum knew there were inaccuracies in the statement of the drilling rigs' worth in the Prospectus. In *Berry Petroleum Co. v.*

*Adams & Peck*, 518 F.2d 402 (2d Cir.1975), the Court held that:

> the time from which the statute of limitations begins to run is not the time at which a plaintiff becomes aware of all the various aspects of the alleged fraud, but rather the statute runs from the time at which plaintiff should have discovered the general fraudulent scheme.

*Id.* at 410. In particular, the Honorable J. Edward Lumbard noted that the plaintiffs could not sustain their allegations of overvaluation of certain properties where a proxy statement issued more than three years (the statutory period) before stated that "the sale of substantially all real estate and oil and gas properties ..., in the opinion of management, may result in substantial losses ... aggregating millions of dollars."

Similarly, in *Bresson v. Thomson McKinnon Securities, Inc.,* 641 F.Supp. 338, 345 (S.D.N.Y.1986), the Honorable Gerard L. Goettel rejected the plaintiff's contention that "he could not have discovered the fraud, had he inquired of it on February 6."[3] Judge Goettel stated that:

> The plaintiff need only have known of the possibility of fraud, not of the actual nature of the alleged fraud. The plaintiff's own pleadings make clear that, as of February 6, 1984, Brown knew, or should have suspected, that the prospectus, registration statement, and other Petro-Lewis communications pursuant to which he purchased his 1983 partnership interest, contained material misrepresentations.

Judge Goettel noted that these disclosures "notified reasonable investors ... of the potential for misstatements and omissions." *Id.* at 347; *see also Hill v. Der,* 521 F.Supp. 1370, 1388 (D.Del.1981) ("[t]he period begins to run when the plaintiff has enough facts to be on notice of the potential claim"); *Rickel v. Levy,* 370 F.Supp. 751, 756 (E.D.N.Y.1974) ("[w]here plain-

---

be drawn from the evidence before the jury. *See Anderson,* 106 S.Ct. at 2511.

3. Thus, Quantum's argument that it was not in possession of all of the facts necessary to put it on inquiry notice is to no avail. Its contention

that it was not an insider of Buttes and thus was not privy to any non-public information about Buttes, such as any concerns being expressed by Buttes' bank regarding the adequacy of their security, is therefore irrelevant.

tiff's own sworn admissions indicate that he was 'suspicious generally' of defendants' activities in a particular matter as of a particular time, summary judgment may be appropriately granted"); *Cook v. Avien, Inc.,* 573 F.2d 685, 697–98 (1st Cir.1978) ("the financial data available to the purchasers provided them with sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale of the [debentures]").

Therefore, because Quantum knew in April, 1985 that the Prospectus contained "misstatements," it was required to bring suit within one year of that time, even if it did not know the extent of those misstatements. It is irrelevant whether or not Quantum knew or could have discovered the extent of the misstatements, since the point at which the limitations period begins to run under § 13 is the "discovery of the untrue statement." Quantum's failure to meet the requirement of the statute of limitations mandates dismissal of the claims with respect to the drilling rigs, without leave to replead.

### B. *Buttes' Agricultural Properties*

In its amended complaint filed on September 1, 1986, Quantum first raised claims concerning the defendants' failure to take or cause to be taken timely writedowns in connection with Buttes' agricultural properties. The defendants challenge those claims on the grounds that Quantum fails to state a claim and is in any event barred by the one-year limitations period.

#### (1) *Failure to State a Claim*

The complaint alleges that Buttes' agricultural properties were carried on the December 31, 1983 financial statements at the lower of cost or estimated net realizable value and that two years later, in December, 1985, Buttes announced a $17,316,000 writedown of its agricultural properties. The complaint also alleges that the properties—at some unspecified point in time—

were worth less than the value shown on Buttes' books.

■ To state a claim under § 11, a complaint must allege that there was a material misstatement in a prospectus. Thus, the complaint must allege that the December 31, 1983 financials in the Prospectus overstated the value of the agricultural properties. While the complaint does not do so explicitly, it may be inferred that the allegation that the properties were worth less than the value shown on Buttes' books refers to the December 31, 1983 financial statements contained in the September, 1984 Prospectus. Therefore, the motion to dismiss this portion of the complaint under Rule 12(b)(6) is denied.

#### (2) *Statute of Limitations*

In moving to dismiss on statute of limitations grounds, the defendants rely on two arguments: that Touche Ross' going concern qualified opinion put the plaintiff on inquiry notice that Buttes might not realize its recorded values for the agricultural properties, and that Buttes had announced expressly in its Form 10Q for the quarter ending June 30, 1985 that there would likely be major writedowns of the agricultural properties.

■ Quantum contends that genuine issues of material fact exist with respect to each of these issues and that conflicting inferences can be drawn from the facts, even taking the defendants' version to be true. The *Touche Ross* qualification (set out more fully above) stated:

> The financial statements have been prepared on the basis of accounting principles applicable to a going concern and do not include any adjustments to the recoverability and classification of recorded asset amounts or the classification of liabilities that might be necessary should the company be unable to continue in existence.

The opinion also referred to Buttes' losses in 1984, to the general decline in drilling activity and worldwide oversupply of rigs, and to projected losses through 1985, and stated that the ability of the company to continue to exist depended on achieving

profitable operations from the contract drilling and workover segment in the future and a restructuring of existing debt retirement schedules.

These disclosures do not so clearly warn investors of a known overstatement of the value of the agricultural properties that the defendants should prevail as a matter of law. Most importantly, nothing is said in the opinion about losses or difficulties in the management of the agricultural properties, as opposed to the drilling rigs, that might lead to a lower realizable value for those assets. Second, the values of the agricultural properties, as opposed to the drilling rigs, were already being carried at the lowest of historical value and net realizable value. This disclosure did not necessarily alert investors that Buttes knew that its estimates of market value were grossly overstated.

The disclosures in the June 30, 1985 Form 10Q filed on August 29, 1985 mandate a similar result. The 10Q states:

Commencing in May 1985, the Company has held discussions with its principal secured and senior lenders concerning the need for an overall restructuring of its current debt position. The Company's restructuring plan contemplates a substantial shrinkage of the consolidated balance sheet. It provides for maintaining the core businesses of North American oil and gas operations and domestic and international contract drilling, although disposition of a substantial number of rigs is planned. Potentially all the rigs could be disposed of. the disposition of drilling rigs is expected to result in a material writedown of the book value with respect to such rigs, but the amount of the writedown cannot be determined until such disposition occurs. Under the Company's restructuring plan, other assets, principally in the minerals and agricultural areas, would be disposed of. The timing and magnitude of such assets writedowns are to a large extent outside the control of the Company, but the amount of such writedowns may be very large unless the debt associated therewith is forgiven in whole or in part.

■ While the defendants contend that the language "such assets writedowns" in the last quoted sentence refers to the agricultural assets mentioned in the previous sentence, it is also a reasonable conclusion from the paragraph as a whole that "such assets writedowns" only refers to the writedowns already mentioned in connection with the drilling rigs. Thus, even though the 10Q was filed more than a year before the complaint was amended to include this claim,[4] a question as to the nature of the disclosure remains.

Therefore, the motion to dismiss the agricultural properties claim on statute of limitations ground is denied.[5]

## II. *The Katz Complaint*

The *Katz* complaint is based on essentially the same factual allegations concerning writedowns of the drilling rigs and agricultural properties as the *Quantum* complaint. The *Katz* complaint further alleges that between March 29, 1984 and November 18, 1985 Katz purchased $270,000 in face amount of Buttes' $10\frac{1}{4}\%$ Subordinated Debentures (the "$10\frac{1}{4}\%$ Debentures"). At some unidentified time he sold $128,000 face amount of the $10\frac{1}{4}\%$ Debentures at a

---

**4.** The amended claim concerns a completely separate aspect of Buttes' business, located in a different geographic area, and which involves a different basis of accounting—the lower of cost or market. The original complaint raised only the claim that Buttes' contract drilling equipment was being carried at historical cost when its current value was much lower. Since the original complaint did not give adequate notice that a claim concerning the agricultural properties would be made, the amendment does not relate back to the filing date of the original complaint. *See Rosenberg v. Martin,* 478 F.2d 520, 526 (2d Cir.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973).

**5.** Because this court has denied in part the motion to dismiss the complaint, it must reach the defendants' claim that the aiding and abetting allegations in the complaint should be dismissed for failing to state a claim. The motion to dismiss these claims is granted in accordance with this court's opinion in *Bresson v. Thomas McKinnon Securities,* 641 F.Supp. 338 (S.D.N.Y. 1986) which held that there is no aiding and abetting liability under § 11.

loss of $27,631; he still holds $142,000 face amount of the bonds.

Where the *Quantum* complaint sought relief under § 11 of the Securities Act of 1933, the *Katz* complaint seeks relief under § 10(b) and § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and § 78t(a), Rule 10b–5, 17 C.F.R. 240.10b–5, and common law principles of fraud. Katz seeks to represent a class of all those who purchased 10¼% Debentures between March 29, 1984—the date Buttes' 1983 financial statements were filed with the SEC—and November 18, 1985—three days after Buttes filed for protection under Chapter 11 of the Bankruptcy Code.

The amended complaint alleges that Buttes' directors and auditor, Touche Ross, knew or should have known between March 29, 1984 and November 18, 1985 (the "class period") that the values being reported on Buttes' September 14, 1984 Prospectus, December 31, 1983 10k, and March 31, 1984 and June 30, 1984 10Q's for the drilling equipment and agricultural properties owned by Buttes were materially overstated. As early as November, 1983, the complaint alleges, the Herold Report had appraised the Buttes drilling equipment at $101,000,000, less than half of the value stated in the financials.

### A.(1) *Failure to State Fraud with Particularity: The Drilling Equipment*

Because this action is based on fraud, Katz must satisfy Rule 9(b)'s requirement that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986). To satisfy this requirement the complaint must (1) give particulars as to the respect in which the plaintiff contends the statements were fraudulent, that is, it must indicate which statements the plaintiff claims were false or deceptively incomplete and state why they were false and incom-

plete; (2) detail the time and place at which the statements were made; and (3) identify the defendants charged with having made those statements either directly or as controlling persons or aiders and abetters. *See Goldman v. Belden,* 754 F.2d 1059, 1069–70 (2d Cir.1985). In addition, the complaint must allege facts which give rise to a "strong inference" that the defendants possessed the requisite fraudulent intent. *See Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987).

In the complaint, Katz alleges that Touche Ross violated certain Generally Accepted Auditing Standards and Generally Accepted Accounting Principles by, *inter alia,* failing to adequately disclose that the contract drilling equipment was being carried at cost, failing to disclose that the drilling equipment was worth substantially less than the value at which it was being carried, failing to write the equipment down to its market value, and falsely representing that the 1983 financial statements were presented in accordance with Generally Accepted Accounting Principles. In essence, Katz's claim with respect to the contract drilling equipment is that Touche Ross violated Generally Accepted Accounting Principles by carrying the equipment at historical cost, rather than writing it down to market value during the relevant period.

By alleging that Touche Ross overstated the value of the drilling equipment, Katz has not satisfied *Goldman*'s requirement that the complaint must indicate why the allegedly false or deceptively incomplete statements were false and incomplete. The financial statements are silent on whether the value given to the drilling equipment is historical cost or market value.[6] A statement of value in the financial statements, therefore, is not a misstatement of market value unless one can infer that it represents market value and not historical cost. To support the conclusion that the reported value is an overstatement of the market value, Katz must allege either that the

---

**6.** Touche argues that Generally Accepted Accounting Principles require assets and liabilities to be reported at historical cost. Although this court cannot properly evaluate the factual accu-

racy of that statement on a Rule 9(b) motion, this argument does highlight the pleading deficiencies of the complaint.

accounting principle that governs the way in which equipment is carried on financial statements calls for a statement of market value or that another principle supplants that rule and calls for a writedown to market value at a particular time. *Cf. Posner v. Coopers & Lybrand*, 92 F.R.D. 765, 768 (S.D.N.Y.1981). ("The plaintiff, however, does not specify what this 'substantial amount' is nor ... what accounting practices should have been used"), *aff'd without opinion*, 697 F.2d 296 (2d Cir.1982); *Weinberger v. Kendrick*, 451 F.Supp. 79, 82, 83–84 (S.D.N.Y.1978) ("While plaintiffs have alleged ... that the overstatements resulted from ... [a failure to] conform to standard auditing procedures, this assertion is meaningless without some particularization of the manner in which the calculation did not so conform ..."). Katz's complaint fails to make either allegation.

In addition, Katz must "allege the amount ... of such 'overstatement'.... The general allegations that assets were overstated is clearly inadequate." *Decker v. Massey-Ferguson, Ltd.*, 534 F.Supp. 873, 880–81 (S.D.N.Y.1981), *aff'd in pertinent part*, 681 F.2d 111, 116 (2d Cir.1982); *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 518, 522 (S.D.N.Y.1977); *Weinberger v. Kendrick*, 451 F.Supp. 79, 83 (S.D.N.Y.1978). While Katz alleges that the Herold Report valued the contract drilling equipment at $101 million as of December 31, 1982, it is not clear whether he is alleging that that value was the proper one for the offending SEC filings, which are dated more than a year later—December 31, 1983, March 31, 1984, June 30, 1984 and September 14, 1984. If that is the complaint's intent, the defendants are entitled to a clear allegation of that fact.

■ The defendants also argue that the complaint must set forth the particulars of when the assets should have been written down, not only to apprise defendants of the particulars of Katz's claim in that regard, but to see whether it was before or after he bought, and to determine who is properly in the class. A liberal reading of the complaint, however, establishes that the plaintiff has alleged that the misstatements and omissions occurred in specific documents issued on specific dates, the first of which was dated December 31, 1983, three months before Katz's purchases began, and has alleged that the writedowns or the need for the writedowns should have been disclosed at that time. It is sufficient for the plaintiff to allege that at specific times prior to his purchases the writedowns should already have been taken and disclosed. *See Ross v. A.H. Robins Co.*, 607 F.2d 545, 558 (2d Cir.1979) ("if the defendants' knowledge ... coalesced into a duty to disclose prior to [plaintiffs' purchases] ... the action can be prosecuted as a class action by these named plaintiffs"), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

■ Katz must also set forth the "amount of securities purchased and the specific dates of the transactions," *Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080, 1088 (S.D.N.Y.1977), as well as "the price ... at the time of ... purchase." *Posner v. Coopers & Lybrand*, 92 F.R.D. 765, 769 (S.D.N.Y.1981), *aff'd without opinion*, 697 F.2d 296 (2d Cir.1982). The complaint fails to identify either the dates or the prices of Katz's transactions.

■ Defendants also argue that the complaint fails to satisfy Rule 9(b) because it fails to indicate the role played by each individual defendant in the preparation or dissemination of the allegedly fraudulent documents. The complaint alleges that:

> The Individual Defendants, because of their positions of control and authority as officers and/or directors of Buttes were able to and did control the content of Buttes' public statements, SEC filings during the class period and of a Prospectus dated September 14, 1984 ... used to offer and sell Buttes' 16½% Senior Subordinated Debentures, including the various financial statements contained therein.

While the complaint does not particularize the role each defendant played, such allegations are unnecessary where, as here, they involve "misstatements or omissions in documents—annual reports, financial statements—that may be presumed to entail the

collective actions of the directors, officers and the accountant." *Somerville v. Major Exploration, Inc.,* 576 F.Supp. 902, 911 (S.D.N.Y.1983); *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986) ("no specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question"); *Block v. First Blood Associates,* 663 F.Supp. 50 (S.D.N.Y.1987).

### (2) *The Agricultural Properties*

 Katz alleges that, at some unspecified time, the agricultural properties were worth less than the value listed on the December 31, 1983 financial statements, which stated explicitly that the agricultural properties were being carried at the lowest of cost or net realizable value. In support of this claim he alleges only that on December 5, 1985, two years later, Buttes announced a writedown of $17,316,000 for its agricultural properties from the $43,731,-000 value listed on the 1983 financial statements. Even construed liberally, the complaint does not allege that the value of the agricultural properties at the time of the 1983 financial statements was overstated by $17 million. Therefore, the agricultural properties claims are dismissed.

### B.(1) *Inference of Fraud: The Drilling Equipment*

 Under Second Circuit precedent, Katz must plead facts that give rise to a strong inference of fraudulent knowledge.[7] *See Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987); *Devaney v. Chester,* 813 F.2d 566 (2d Cir.1987); *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987). Katz contends that the market value of the drilling equipment was available to the defendants and known within the oil industry by virtue of the Herold Report at the same time that the defendants were carrying the equip-

ment at the much higher historical cost, thus giving rise to an inference of fraud.

Even assuming that the reported values of the equipment were overstatements, it is well settled that the mere fact that the value of an asset has been overstated in financial statements does not give rise to any inference of fraud. *See Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 523 (S.D.N.Y.1977) ("this court has uniformly held that overstatements of accounts receivable or net sales, without more, are merely 'neutral facts' from which no inference of impropriety logically flows"); *Skubik v. Leeds,* Fed.Sec.L. Rep. (CCH) ¶ 97,986 at 91,069 (S.D.N.Y. May 13, 1981) [Available on WESTLAW, DCT database] ("The fact that a financial report contains overstatements ... does not give rise to an inference of impropriety").

The present case is an even stronger case for dismissal, for the alleged "overstatements" depend on an allegation absent from the complaint—that the value listed on the balance sheet represented market value. An inference of fraud must arise in connection with the manner in which Touche Ross carried the equipment on the balance sheet, not merely in connection with the equipment's actual value. Touche Ross' knowledge of the market value of the equipment means nothing if Touche Ross is required by Generally Accepted Accounting Principles to report a value other than market value. Thus, the mere allegation of market value of the drilling equipment, without more, does not give rise to an inference of fraud.

### (2) *The Agricultural Properties*

 The complaint alleges that Buttes' agricultural properties were carried on the December 31, 1983 financial statements at the lower of cost or estimated net realizable value and that two years later, on December 5, 1985, Buttes announced a $17,-316,000 writedown of its agricultural properties. The complaint then concludes that

---

7. With respect to the individual defendants, the complaint fails to even allege that they acted with the necessary scienter. It alleges only that "[n]one of them made a reasonable investigation or possessed grounds for reasonable belief that the statements complained of herein were true and were without omissions of any material facts." Thus, the complaint is deficient in that respect.

the agricultural properties were worth less than the value shown on its books.

These allegations are insufficient to give rise to an inference that the values reflected in the December 31, 1983 were incorrect, much less fraudulently incorrect. A writedown to liquidation value *two years after* the financial statements in issue, and after Touche's April 1985 going concern qualification, and after Buttes' November 15, 1985 bankruptcy filing, says nothing about the accuracy of the 1983 financials or Touche's knowledge or intent in preparing them.

### (3) *Pleading on Information and Belief*

 Except for Paragraph 9 of the complaint, which alleges the total amount of Katz's purchases and the dollar amount of his loss thereon, the entire complaint is based on information and belief. In turn, Katz alleges in ¶ 39 that his information and belief:

> is based upon facts set forth in the Annual Reports, SEC filings and financial statements ... as well as articles appearing in The Wall Street Journal and the complaint filed in an action entitled *Quantum Overseas, N.V. v. Touche Ross & Co.*, 86 Civ. 4059 (RWS) presently pending in this Court.

Although defendants quote *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir.1972), for the proposition that "Rule 9(b) pleadings cannot be based 'on information and belief,'" that decision does not mandate dismissal here. The fault with the complaint in *Segal* was its entirely conclusory nature and lack of a statement of facts on which the belief of fraud was founded. *Id.* The Court emphasized that the plaintiff's conspiracy claims were "obviously founded more on an examination of Rule 10b–5 than on an investigation of the facts of the alleged fraud." *Id.*

Such is not the case here. Although Katz does base his claims on "public documents available to all," as the defendants claim, the defendants have not shown why that fact renders the complaint deficient. Many of the allegations in the complaint,

while based on "information and belief," are specific and give the defendants notice of the essential claim of the complaint—that Katz bought and sold debentures based on a value given for certain of Buttes' assets that should have been written down as early as December 31, 1983. This is not a case where the plaintiff asks the court to infer knowledge and intent without any factual basis at all. Thus, the mere fact that Katz has asserted claims based on information and belief does not render the complaint invalid.

In sum, the defendants' motion for summary judgment in *Quantum* on the drilling rigs claims is granted, while the motions under Rule 12(b)(6) and Rule 56 with respect to the agricultural claims are denied. Therefore, *Quantum*'s drilling rig claims are dismissed, without leave to replead. The motion to dismiss for failure to plead fraud with particularity in *Katz* is granted, with leave to replead.

Because of this court's familiarity with the issues herein, which, it can be anticipated, will rise again on further amendments to the pleadings and motions to dismiss, the defendants' alternative motion to transfer the actions to the Southern District of Texas will be denied at this time, with leave to renew.

IT IS SO ORDERED.