**Peter G. SCHICK, et al., Plaintiffs,**

v.

**ERNST & YOUNG, Defendant.**

**No. 90 Civ. 1005 (RWS).**

United States District Court,
S.D. New York.

Dec. 16, 1992.

Beigel & Sandler, Ltd., New York City (Marilyn Neiman, of counsel), and Beigel & Sandler, Ltd., Chicago, IL, for plaintiffs.

Ernst & Young, New York City (Michael J. Eng, of counsel), pro se.

## OPINION

SWEET, District Judge.

Defendant Ernst & Young ("E & Y") has moved to dismiss the second amended complaint for failure to plead fraud with particularity under Fed.R.Civ.P. 9(b), for failure to state a claim under Fed.R.Civ.P. 12(b)(6),[1] for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), and for failure to file the securities laws claims within the statute of limitations for actions under 15 U.S.C. § 78j(b) (1988). For the following reasons, the motion is granted.

*The Parties*

The plaintiffs (the "Investors") purchased interests between 1980 and May

---

**1.** Because E & Y does not argue for dismissal based on failure to state a claim, that ground shall not be addressed in this opinion.

1986 in various limited partnerships which were involved in the business of buying, breeding and selling thoroughbred race-horses and bloodstock (the "Limited Partnerships"). The Investors and others have sued the organizers, promoters and managers of the Limited Partnerships in related actions for alleged securities fraud and other misdeeds. The claims of the plaintiffs are described in further detail in earlier opinions in both cases, *Bruce v. Martin*, 87 Civ. 7737 (RWS), *Thornock v. Kinderhill Corp.*, 88 Civ. 3978 (RWS), familiarity with which will be assumed. The Investors and their claims in this action and the related actions have been considered in prior opinions of this court. *See Schick v. Ernst & Whinney*, Fed.Sec.L.Rep. (CCH) ¶ 95,764, 1991 WL 8543 (S.D.N.Y.1991) *("Schick I")*, *Schick v. Ernst & Whinney*, Fed.Sec. L.Rep. (CCH) ¶ 96,089, 1991 WL 61074 (S.D.N.Y.1991); *Schick v. Ernst & Young*, 141 F.R.D. 23 (S.D.N.Y.1992) *("Schick II")*.

Defendant E & Y is a national accounting firm alleged to have provided auditing, accounting, tax and related financial advice and services to the Limited Partnerships, Kinderhill Corporation, Kinderhill Select Bloodstock, Inc., Kinderhill Financial Services, and Kinderhill Investment Company (together, the "Kinderhill Entities") between 1985 and 1988. E & Y was substituted as a successor entity to Ernst and Whinney in the Second Amended Complaint.

Thomas A. Martin ("Martin") is a citizen of the State of New York who was a general partner of the Limited Partnerships.

The Kinderhill Corporation ("Kinderhill") is a Delaware corporation that was a general partner of the Limited Partnerships.

Kinderhill Select Bloodstock, Inc. ("Select") is a Delaware corporation created by the exchange of all of the assets of most of the Limited Partnerships for new common stock in Select in 1987 (the "Select Roll-Up").

### Prior Proceedings

The Second Amended Complaint asserts claims against E & Y alleging primary liability for securities fraud in violation of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.-10b–5, common law fraud, breach of fiduciary duty, and negligence. In an opinion and order of January 18, 1991, *Schick I*, this court dismissed the original complaint pursuant to Rules 9(b) and 12(b)(6), Fed. R.Civ.P. as against E & Y with leave to replead, and as against defendants Key Bank and Peat Marwick Main & Co. ("Peat Marwick") with prejudice. On April 5, 1991, *Schick I* was modified to the extent of allowing the Investors to replead a claim against E & Y for primary liability only under § 10(b) and Rule 10b–5. *Schick v. Ernst & Whinney*, Fed.Sec.L.Rep. (CCH) ¶ 96,089, 1991 WL 61074 (S.D.N.Y.1991).

The Investors filed an Amended Complaint on May 7, 1991. This, too, was dismissed for failure to plead fraud with particularity in this Court's opinion dated January 10, 1992 (Schick II). The Amended Complaint alleged, *inter alia*, that Ernst and Young knew that the investments in Select were illiquid and that Kinderhill was insolvent in the sense that it would not be able to pay its debts as they became due. This Court found that the plaintiffs had not alleged a sufficient factual basis for inferring that E & Y knew that Kinderhill's debts were such that it was insolvent, or that Kinderhill was liable as an indemnitor of various sureties and guarantees of the Partnerships—a situation which, the plaintiffs allege, rendered the debts due Kinderhill by the Partnerships illusory and so helped to overstate Kinderhill's assets. The Amended Complaint was dismissed with leave to replead on the grounds that the plaintiffs had not alleged sufficient facts to support an inference of scienter.

The Second Amended Complaint was filed on January 29, 1992. Oral argument was heard on July 1, 1992. Further submissions were received and the motion was considered fully submitted on July 16, 1992.

### The Facts

The Second Amended Complaint makes essentially the same accusations against E & Y as the Amended Complaint. The plain-

tiffs allege that between 1980 and mid–1986, Martin and Kinderhill, the general partners of the Limited Partnerships, organized approximately twenty-six limited partnerships in the business of thoroughbred breeding and racing. Through these partnerships, the Investors allege, Martin and Kinderhill perpetrated a fraud against them by means of a "Ponzi scheme." According to the Second Amended Complaint, Martin and Kinderhill continually formed new limited partnerships and caused them to buy and sell assets between each other at unrealistic prices to artificially inflate the Kinderhill entities' asset base, and thus to make them appear successful so as to encourage investment in the new limited partnerships. Sales of interests in the limited partnership were promoted through private placement memoranda (the "Partnership PPMs") and other sales literature that contained allegedly false and misleading representations and omitted to state material facts, and resulted in the presentation of a favorable picture of the financial health of the limited partnerships. Among other things, the Partnership PPMs are alleged to have failed to disclose the large volume of interpartnership transactions (the "related party transactions" or "RPTs") at artificially set prices, Martin's siphoning of funds for his personal use, successive pledging and assignment of promissory notes to banks, and the pyramiding of these notes by using funds from such assignments to acquire assets from existing limited partnerships which assets in turn were pledged to banks for additional financing.

E & Y's allegedly fraudulent activities relate to an exchange offer consummated in early 1987 whereby Select was formed to acquire all of the assets of the Limited Partnerships in exchange for common stock of Select in a roll-up. According to the Second Amended Complaint, the Investors exchanged their Limited Partnership interests for shares in Select in reliance on a private placement memorandum and its supplements (the "Select Memorandum"), issued on October 10, 1986, and on the audited consolidated balance sheet of the Kinderhill Corporation and its subsidiaries dated June 30, 1986 (the "June 1986 Balance Sheet") which was contained in the Select PPM and which was allegedly prepared by E & Y with knowledge that it would be included in and used by investors reviewing the Select PPM. (Plaintiffs' Amended Complaint ¶ 32).

The Second Amended Complaint alleges that the Select Memorandum and the June 1986 Balance Sheet contained material misrepresentations and omitted material information upon which the Investors relied in acquiring their interests in Select. Because the only document audited by E & Y on which the plaintiffs could have relied to their detriment was the June 1986 Balance Sheet[2] (Plaintiffs' Second Amended Complaint ¶¶ 32, 34 [hereinafter designed as Complaint ¶ or solely ¶]), only those misrepresentations in and omissions from the June 1986 Balance Sheet shall be considered.

In the June 1986 Balance Sheet, E & Y is again alleged to have:

(1) Overstated the current assets of Kinderhill in the amount of $11 million in accounts receivable due from the Limited Partnerships. Complaint at ¶ 35. Because these were the product of a ponzi scheme, it was highly improbable that any accounts receivable from the Limited Partnerships would be properly repaid. *Id.* at ¶ 61(a). Moreover, E & Y had been warned by its predecessor Peat, Marwick that should the general partner fail, the limited partnerships might fail also because they were so highly leveraged (the "domino effect statement"). *Id.* at ¶ 61(c). The plaintiffs allege that E & Y failed to include the domino effect statement in the notes to the audited balance sheet.

(2) Failed to disclose the routine nature of affiliated transactions through which the Limited Partnerships bought and sold bloodstock, *id.* at ¶ 63; the percentage of total transactions that these transactions comprised, *id.* at ¶ 41(b); and the fact that

---

**2.** The complaint states that "[a]ll other documents referred to as prepared by Ernst & Young were not disseminated to plaintiffs and were not disclosed to plaintiffs." ¶ 34.

bloodstock in many cases could not bring a comparable price at public auction and that the bloodstock were priced based on appraisals that did not accurately reflect their fair market value at the time of affiliated transactions. *Id.* at ¶ 41(d).

(3) Represented that the consolidated balance sheet in the June 1986 Balance Sheet fairly represented the financial position of Kinderhill and related subsidiaries when it in fact did not because it did not include, as it should have according to generally accepted accounting principles (GAAP), "going concern" and "liquidity" qualifications. *Id.* at ¶ 75. If these had been included, they would have revealed that the Limited Partnerships as rolled-up would be unable to continue profitably in business without engaging in related transactions, that the Limited Partnerships were illiquid and that Kinderhill was at the time or soon would be insolvent and could not continue as a going concern, and that the bloodstock which generated accounts receivable and payable was pledged to Key Bank as security for loans. *Id.* at ¶ 81.

(4) Omitted to disclose the amounts of loans extended to the Limited Partnerships for which Kinderhill was liable as general partner, *id.* at ¶ 68, and failed to disclose Kinderhill's liabilities as indemnitor of the sureties on plaintiffs' notes to the limited partnerships. *Id.* at ¶ 35.

*Discussion*

### Claims Barred By the Statute of Limitations

E & Y alleges that Plaintiffs' claims are barred under *Lampf v. Gilbertson,* — U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) and *James Beam Distilling Co. v. Georgia,* — U.S. ——, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991). In these decisions the Supreme Court held that the applicable statute of limitations for Section 10(b) is the one year from discovery or three years from the time of fraud, and that this new rule of law was to be applied retroactively to all pending cases. These decisions together would bar consideration of plaintiffs' claims, but Congress overruled the retroactive aspect of the law in the *Federal Deposit Insurance Corporation Improve-ment Act of 1991*, Pub.L. No. 102–242, §§ 476, 27A, 105 Stat. 2236 (§ 27A).

E & Y argues that this legislation is unconstitutional. However, this court has already decided the question in *Rabin v. Fivzar,* 801 F.Supp. 1045 (S.D.N.Y.1992):

> Within this district, the Honorable Morris E. Lasker and William C. Conner have upheld the constitutionality of the statute against the challenges made by the defendants.... After reviewing the relevant authorities, and mindful that a court must construe a statute in a manner which renders it constitutional if fairly possible,.... I join in my esteemed colleagues' assessment of § 27A.... § 27A violates neither separation of powers principles nor the due process clause of the Fifth Amendment. The statute effects a change in the law underlying § 10(b) claims which does not contravene constitutionally grounded Supreme Court decisions and does not upset the finality of judgments of the federal courts, either facially or as applied."

The Investors' complaint is dismissed because of its failure to plead fraud with particularity, not because it is time-barred under 15 U.S.C. § 78j(b).

### Rule 9(b) and Section 10(b)

■ E & Y argues that the Second Amended Complaint fails, as did its two predecessors, to plead the federal securities law and common law fraud claims in conformity with the particularity requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). We agree.

Plaintiffs have fleshed out their earlier claims with more details about certain documents, presumably turned over during discovery, whose contents apparently formed the factual allegations of the prior complaint. For example, in place of alleging that Kinderhill's former accountants, Peat Marwick, warned E & Y that interpartnership transactions were occurring at more than market value, Plaintiffs cite a document prepared by E & Y and dated November 4, 1985, entitled "Kinderhill Farm Partnerships December 31, 1985 Meeting with Prior Accountants," which

contained this information. Complaint at ¶ 41. Instead of merely alleging that E & Y "knew" the partnerships were illiquid, Plaintiffs have demonstrated that E & Y calculated liquidity pursuant to its "Audit Planning Memorandum Kinderhill Farms Partnership December 31, 1985." *Id.* at ¶ 45.

Although these allegations are now adequately alleged, however, they still fail to show how E & Y was an insider with scienter of the fraud. Since Plaintiffs now charge E & Y solely as a primary defendant under 10(b) (see *Schick v. Ernst & Whinney,* Fed.Sec.L.Rep. (CCH) ¶ 96,089, 1991 WL 61074 (S.D.N.Y.1991)), Plaintiffs must allege every element of 10(b) fraud with the particularity required by Rule 9(b):

> "Allegations of fraud including securities fraud must specify the time, place and speaker, and content of the alleged fraudulent misrepresentations in order to comply with Rule 9(b) of the Federal Rules of Civil Procedure.... In addition, Rule 9(b) requires that plaintiffs provide particular facts in the pleading supporting each of the six elements of a § 10(b) violation.... Those six elements are: (a) a misstatement or omission by the defendant (2) as to a material fact, (3) relied upon by the plaintiff, (4) involving scienter on the part of the defendant, (5) made in connection with the purchase or sale of security, and (6) causing damage to plaintiff..... [P]laintiffs [must plead] each of the six elements of a § 10(b) claim with the requisite particularity for each of the relevant investments."

*Varnberg v. Minnick,* 760 F.Supp. 315, 326–27 & n. 32 (S.D.N.Y.1991) (citations omitted). This they still fail to do. While reference to particular documents does substantiate what E & Y knew and when it knew it, the facts now alleged still fail to raise an inference of scienter.

Although this court set out in detail the Rule 9(b) standards in its previous opinion, certain aspects of that discussion must be repeated here. Rule 9(b) states that:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Since "Rule 9(b) is especially designed to protect the reputation of accountants and other professionals from injury caused by unsubstantiated charges of fraud," (*O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 227 (S.D.N.Y. 1989) *aff'd* 936 F.2d 674 (2d Cir.1991)), the complaint must allege factual circumstances that give rise to a "strong inference" that the defendant had the requisite fraudulent intent. *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). Where, as here, Plaintiffs identify an alleged insider as being responsible for only one of the fraudulent documents (the June 1986 Balance Sheet), Plaintiffs must allege facts about that document which, if proven, would demonstrate fraudulent intent on the part of E & Y.

The Specific Allegations Fail to State a Claim Under Rule 10(b) with the Particularity Required by Rule 9(b)

The plaintiffs base their claim of E & Y's knowledge of the Ponzi scheme on the Peat, Marwick's "domino" statement, on the disclaimer that the Limited Partnerships might have to sell off assets ahead of schedule, *id.* at ¶ 52, and on E & Y's knowledge of the frequency of the transactions between the limited partnerships at above-market rates. *Id.* at ¶ 45.

Even when taken together, these statements do not reveal scienter of the fraud. The domino statement can be explained simply in terms of the highly leveraged nature of the partnerships, which all parties knew about, and which was due to the partnerships' use as tax shelters. *Id.* at 45(b). The fact that the partnerships, at various points, had had to sell bloodstock ahead of schedule does not inherently imply a ponzi scheme. Even the admission that the partnerships engaged in numerous interpartnership transactions is not inher-

ently suspicious, when even the plaintiffs admit that Kinderhill gave the impression that these were necessary for enabling the actual business of the partnerships—horseraising—to function properly. "Each of the partnerships enter into transactions (for stallion services, boarding and maintenance, bloodstock purchase/sale, advancing of funds, etc.) with the General Partner and other partnerships." Complaint at ¶ 45(c). Although plaintiffs allege that these interpartnership transactions inflated the assets, they simply allege that "all" the accounts were worthless ("The accounts receivable were in fact of no value because they were generated as part of the ponzi scheme described above." *Id.* at ¶ 61). The only factual allegations to support this are statistics to show that while assets may have been overvalued (*e.g.,* "actual proceeds of 1984 sales were only at 75% of appraised value," *id.* at ¶ 42(c))) they were not valueless. The Second Amended Complaint still fails to allege adequately the amount of the purported overstatement. *Quantum Overseas, N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 667 (S.D.N.Y.1987); *Seiden v. Butcher,* 458 F.Supp. 81, 83 (S.D.N.Y.1978) (plaintiff must specify what is overvalued, the amount of the overvaluation and facts underlying allegation that assets were "knowingly" overvalued).

The second allegation relates to the distinction between calling these transactions "numerous" as opposed to "ordinary" and the conditionality of the values. In fact, E & Y's description that the assets "would" have sold for less on the open market is more technically accurate than the terms the plaintiffs state E & Y should have used. *Id.* at ¶¶ 61–63. The related party transactions were revealed; therefore, they cannot be considered to be a misleading omission. *See Schick I.* As the Court stated then, this disclosure also calls into question the adequacy of the Amended Complaint's pleading of E & Y's scienter on this point, as it indicates that any omission

was not the result of "conscious behavior" to defraud.

The Investors also maintain that, based on the precarious financial situation of Kinderhill, E & Y should have included going concern and liquidity analyses that would have warned the Investors of Kinderhill's potential downfall. E & Y had received warnings about liquidity from P & M and knew that a previous accounting firm had issued a draft disclaimer rather than sign accounting statements because of its liquidity concerns. E & Y itself had conducted a liquidity analysis which revealed that the partnerships were illiquid. The plaintiffs claim that all these facts support a claim that E & Y should have included at least a liquidity warning, if not a going concern disclaimer.

This only supports an inference of negligence, however. E & Y did not show "an egregious failure to see the obvious, or investigate the doubtful," *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y.1989). In fact, E & Y did investigate—it authorized a liquidity analysis, and notations on the audit program indicate it was performed (as plaintiffs admit, at ¶ 44). Based on this analysis, E & Y decided that Kinderhill was a going concern, and therefore did not include a qualification on the June 1986 Balance Sheet. Plaintiffs have alleged nothing to show this decision was not made in good faith. At best, this alleges only negligence.

Moreover, under the circumstances, this might not even be negligence. GAAP interpretation statements as promulgated by the American Institute of Certified Public Accountants (AICPA) state that a going concern value is only good for a reasonable period of time (the Auditing Standard Board's (ASB) Statement on Auditing Standards (SAS) Nos. 34, 59).[3] The new standard (No. 59) was designed to clarify am-

---

**3.** The accounting principle cited by plaintiffs, ASB's Statement on Auditing Standards 34 or 340, "The Auditor's Considerations When a Question Arises About an Entity's Continued Existence," ¶ 77(a), was superseded in April 1988 by a new Statement on Auditing Standards No. 59 or 590, "The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern."

biguous terms in the old, one of which was the phrase "reasonable time":

> "The idea of 'a reasonable period of time,' ... has been defined in SAS 59 to be a period 'not to exceed one year beyond the date of the financial statements being audited.'.... SAS 59 helps clarify that issue by placing the period at issue as one year from the balance sheet date.... It also suggests that under some circumstances the auditor does not even need to look out one year. 'One year' is the outside time limit and, if an entity such as a retailer operates on a shorter business cycle, it may be argued that the reasonable period of time is that shorter business cycle, not one year from the balance sheet on which the auditor is reporting."

John Matson, *The Litigation of Going Concern Questions,* 63 Corp.L. & Prac. 611 (1988). Plaintiffs allege their investments now are worthless—but they do not allege that the limited partnerships were no longer a going concern as of June 1987, the date on which any obligation of E & Y to qualify its statements with a going concern value would have lapsed under SAS 34.

The last allegation—that E & Y knew that Kinderhill had such undercollateralized liabilities that it would not be able to pay its debts as they became due—again can support only an inference of negligence on the part of E & Y. The Investors allege that Kinderhill was liable as a general partner on the loans owed by the Limited Partnerships to Key Bank, that with the fall in the value of the bloodstock 87% of the value was now pledged, and that E & Y should have included these guarantees, at ¶¶ 81–82. However, the loans in question are loans owed by the limited partnerships—and the plaintiffs only allege that E & Y reviewed the debt agreements of Kinderhill itself, the general partner. While the value of the bloodstock collateral securing the loans from Kinderhill to the limited partnerships had reached 87% of the limit-

ed partnerships' value, this does not explicitly indicate that assets had been pledged twice, which seems to be what the plaintiffs allege. (Complaint at ¶ 72). If assets were actually pledged twice, plaintiffs have stated nothing which indicates that E & Y knew of it. They have only alleged that E & Y stated in its audit planning memorandum that it would review all debt agreements. *Id.* at ¶ 70. It is well settled that an inference of fraud does not arise from the fact that an auditor reported on inaccurate data, *O'Brien,* 719 F.Supp. at 228 (citing *The Limited, Inc. v. McCrory Corp.,* 683 F.Supp. 387, 394 (S.D.N.Y.1988)).

The new factual claim that the plaintiffs make to support their allegations is that E & Y was aware that Kinderhill had guaranteed payment of the investor notes which the sureties had bonded for the various limited partnerships. The plaintiffs maintain this was a material fact since, in effect, it increased the liabilities of the general partner. Since a failure on the part of the highly-leveraged general partner would have the triggered the "domino effect," the plaintiffs seem to reason that any debts or obligations incurred by the general partner were therefore material. Although the conversations by which the auditors learned of this with Martin and other Kinderhill employees remain undated and unspecified, and therefore insufficiently particular, the plaintiffs state that E & Y must have learned of this extra potential liability since it reviewed the surety bonds securing the collection of the investor notes. Complaint at ¶ 82. Again this fails to allege scienter on the part of E & Y. Plaintiffs allege that "the financial well being of Martin and Kinderhill was necessary for the viability of the limited partnerships and Select," (at ¶ 81(h)) but this does not establish that Kinderhill would cease to be financially viable. Plaintiffs have cited no accounting principle which requires all security interests and pledges, of whatever kind, to be included on the annual balance sheet.[4]

---

**4.** Typically, a loss contingency should be accrued if two conditions are met: if information prior to issuance of the financial statements indicates that it is probable that the liability has already been incurred at the date of the finan-

cial statements, and that the amount of the loss can be reasonably estimated. FASB SAS No. 5, "Accounting for Contingencies." Plaintiffs do not allege either condition in connection with Kinderhill's guarantees of the surety bonds.

The omission of this contingent liability, without more, raises no inference of fraud and suggests only negligence.

Since Plaintiffs have therefore failed to plead any facts which raise an inference of scienter on the part of E & Y with the particularity required by FRCP 9(b), the federal claims are dismissed.

### E & Y's Fiduciary Duty to the Plaintiffs

The remaining three commonlaw claims (commonlaw fraud, breach of fiduciary duty, and professional negligence) may be dismissed for lack of pendent jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). In this context it is curious to note that both Plaintiffs and E & Y appear to agree that New York law applies. The threshold question in deciding state-law claims, such as professional negligence, is the appropriate choice of law. *Vereins–Und Westbank, A.G. v. Carter*, 691 F.Supp. 704, 708 (S.D.N.Y.1988). However, in the interests of judicial economy, it is appropriate to address the issue as briefed by the parties in order to prevent further insufficient pleadings.

The common law fraud claims fail for the same reasons as the 10(b) claims. The elements of common law fraud in New York are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation which causes damage to the plaintiff. Each element must be established by clear and convincing evidence. *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987). Since the allegations of Plaintiffs fail to allege any clear or convincing evidence sufficient to support their allegation of E & Y's intent to defraud, Plaintiffs have failed to state a claim under common law fraud.

■ Plaintiffs' state-law claims for professional negligence and breach of fiduciary duty fail because, under New York law, E & Y owed the plaintiffs no fiduciary duty and therefore cannot be liable to them in negligence.

Judge Cardozo held that an accounting firm owes a duty of due care only to those in privity of contract with it or to those whose use of its services was the end and aim of the transaction. *Ultramares Corp. v. Touche*, 255 N.Y. 170, 182–83, 174 N.E. 441 (1931). In *Ultramares*, the accounting firm had prepared for a client 32 copies, each certified as "original", of a balance sheet which the accounting firm knew the client would exhibit to third parties as a basis for securing loans and other financial backing. Concerned that there existed no obvious way to predict or limit the effect of words, as opposed to physical actions, Cardozo concluded that "a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Id.* at 179, 174 N.E. 441; *see Vereins–Und Westbank*, 691 F.Supp. at 708.

This is still generally the law on the duty of professionals in New York, but the duty of accountants under *Ultramares* has been expanded to encompass reasonably foreseeable reliance provided it lies "within the contemplation of the parties to the accounting retainer." *White v. Guarente*, 43 N.Y.2d 356, 361, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315 (1977). In *White*, the accounting firm had prepared statements designed to be used by existing limited partners in preparing their tax returns. The court held:

> the accountant must have been aware that a limited partner would necessarily rely on or make use of the audit and tax returns of the partnership, or at least constituents of them, in order to properly prepare his or her own tax returns. This was within the contemplation of the parties to the accounting retainer. In such circumstances, assumption of the task of auditing and preparing the returns was the assumption of a duty to audit and prepare carefully for the benefit of those in a fixed, definable and contemplated group whose conduct was to be governed, since, given the contract and the relations, the duty is imposed by law and it is not necessary to state the duty in terms of contract or privity.

*Id.* at 361–62, 401 N.Y.S.2d at 478, 372 N.E.2d at 319 (citations omitted). This is an example of the type of contact between the accountant and the third party which is close enough to come under *Ultramares'* narrow exception to privity.

The New York Court of Appeals created the "Credit Alliance test" out of *Ultramares* in *Credit Alliance v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985). It restated the *Ultramares* rule as follows:

Before accountants may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and 93) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

65 N.Y.2d at 552, 493 N.Y.S.2d at 443, 483 N.E.2d at 118. Plaintiffs have, at most, alleged only the first two: that the accountants must have been aware that the financial reports were to be used for the Select Memorandum (based on the fact the reports were prepared in June, instead of the more customary October), and that the owners of the limited partnerships were the known parties. However, they have not alleged the third.

In support of their argument that preparation of the June 1986 balance sheet evinces the accountants' knowledge of their reliance, plaintiffs cite *Meranus v. Gangel,* 85 Civ. 9313 slip op., 1989 WL 240072 (S.D.N.Y. August 9, 1989), where tax opinions included in the partnership offering did demonstrate the tax attorneys' knowledge of the plaintiffs' reliance. Plaintiffs misconstrue that case, which is actually in full accord with existing law:

Although the tax opinions were uniformly addressed to the partnerships, care of the general partners, we take judicial notice ... that the only parties to the transaction concerned with its tax consequences were the prospective limited partners, since the partnership itself was not a tax-paying entity. Plaintiffs are therefore entitled to an inference that the only purpose of the tax opinion was to convey a view of the likely tax consequences for the purpose of inducing investment in the limited partnerships.

*Meranus,* slip op. at 11. *Meranus* is justified on a more precise ground than Credit Alliance's general exception to professional contract, since here, in effect, the client asked the attorney to prepare the opinion for the exclusive benefit of the third party. "When a lawyer at the direction of her client prepares an opinion letter which is addressed to the third party or which expressly invites the third party's reliance, she engages in a form of limited representation." *Crossland Sav. FSB. v. Rockwood Ins. Co.,* 700 F.Supp. 1274, 1282 (S.D.N.Y.1988). Under such circumstances these "opinion letters do not constitute advice to a client, but rather were written at the client's express request for use by third parties." *Vereins–Und,* 691 F.Supp. at 714.

Plaintiffs have cited no case involving accountants, and it is hard to imagine how a balance sheet drawn up for a business entity could not constitute a service rendered by the accountants to that entity. The Credit Alliance test for accountants usually requires some evidence of an actual nexus between the accountants and the third parties to verify the accountants' knowledge of the third party's reliance. Where the accountants to a target firm sent audit letters directly to the acquiring company in *Devaney v. Chester,* Fed.Sec. L.Rep. (CCH) ¶ 92,747, 1986 WL 5101 (S.D.N.Y.1986), such direct dealing was precisely the sort of necessary link sought to meet the third requirement of the Credit Alliance test. Where accountants for a dealer in government securities themselves mailed audits of the dealer to plaintiffs, "the act of sending such letters directly to the plaintiffs satisfies the conduct requirement." *First Fed. Sav. & Loan Ass'n of*

*Pittsburgh v. Oppenheim,* 629 F.Supp. 427, 434 (S.D.N.Y.1986).

The only fact that the plaintiffs allege which connects them to the accountants was the date on which the balance sheet was prepared, i.e. June, in place of the more customary September. (Complaint at ¶ 33). No other contact is alleged. Under the Credit Alliance test as it has been interpreted in New York, this meets only the first criterion. Therefore, plaintiffs' claims based on negligence or breach of fiduciary duty are dismissed.

*Conclusion*

For all of the foregoing reasons, the Plaintiffs' securities fraud claims are dismissed for failure to plead fraud with particularity. The claims of violations of negligence and fiduciary duty are dismissed for lack of standing. The state law claims are also dismissed for lack of subject matter jurisdiction. In light of the Plaintiffs' ample opportunity to investigate their claims prior to repleading this case, the dismissal of the claims against E & Y is with prejudice.

It is so ordered.