**VEREINS–UND WESTBANK, AG and Rockwood Insurance Company, Plaintiffs,**

**v.**

**Jeffrey E. CARTER, J.E. Carter Energy & Development Corporation, Pettet Energy Corporation, Pettet 1984 Acquisition and Development Program, a Texas Limited Partnership, W. Austin Barsalou, Barsalou and Associates, P.C., and Interdiscount, Ltd., Defendants.**

**No. 86 Civ. 930 (WK).**

United States District Court, S.D. New York.

July 14, 1988.

See also, 639 F.Supp. 620.

Ronald H. Alenstein, Richard E. Haftel, Barbara B. Slott, Shea & Gould, New York City, for plaintiff Vereins–Und Westbank.

Richard DiSalle, Roger Curran, Vivian Murphy, Rose, Schmidt, Hasley & DiSalle, Pittsburgh, Pa., Jeffrey L. Braun, Rosenman & Colin, New York City, for plaintiff Rockwood Insurance Co.

Thomas G. Rohback, Jay G. Safer, Ellen August, LeBoeuf, Lamb, Leiby & MacRae, New York City, for defendants Barsalou and Barsalou and Associates.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

Defendants W. Austin Barsalou ("Barsalou") and his law firm, Barsalou and Associates, P.C., (collectively, "defendants") move for partial summary judgment dismissing plaintiffs' first cause of action for negligent misrepresentation. The question presented is whether plaintiffs Verines–Und Westbank, AG ("Vereins") and Rockwood Insurance Company ("Rockwood"), although not clients of defendants, may nonetheless recover against them for allegedly negligent misrepresentations contained in opinion letters sent to Rockwood, and another set of opinion letters upon which Vereins was specifically invited to rely. Because we conclude that a New York court would sustain the Amended Complaints,[1] the motion is denied.

1. Each plaintiff has filed a separate Amended Complaint.

## FACTS

This litigation involves four oil and gas limited partnerships formed in 1984 by defendants Jeffrey Carter and his corporation, J.E. Carter Energy and Development Corporation. The partnerships are known as Arriola 1984 Acquisition and Development Program ("Arriola"), Splendora 1984 Acquisition and Development Program ("Splendora"), Hardin 1984 Acquisition and Development Program ("Hardin") and Pettet 1984 Acquisition and Development Program ("Pettet"). Barsalou and his law firm served as special counsel to the limited partnerships, the corporate general partners, and the promoter, Jeffrey Carter. Vereins extended funds to the four limited partnerships through the purchase of notes executed by the partnerships in favor of another bank, defendant Interdiscount Ltd. ("IDL"). Rockwood issued surety bonds guaranteeing the payment obligations of the individual limited partners of three of the partnerships.[2]

Each partnership's private placement memorandum and partnership agreement required the limited partners to pay their respective capital contributions in the form of a 20% cash down payment, with the remaining 80% being paid in the form of a promissory note executed to the partnership. The private placement memoranda further provided that the general partner of each limited partnership would then use these promissory notes as collateral security to obtain a bank loan, the proceeds of which would be used to acquire and develop interests in oil and gas wells.

### A. *Vereins*

In December 1984 and January 1985, IDL made loans to each partnership, evidenced by the execution of a partnership note. Each partnership also executed a Note Pledge Agreement, drafted by Barsalou, whereby the partnership pledged the promissory notes to IDL as collateral security. Vereins subsequently purchased the partnership notes from IDL by means of Note Purchase Agreements, and IDL, by means of another document entitled Note Pledge Assignment, assigned all its rights in the partnerships' Note Pledge Agreements to Vereins.

Prior to the closings of each of the four loan transactions, Carter instructed Barsalou to prepare an opinion letter for IDL, explaining that counsel for IDL had requested such a letter (Barsalou Dep. 396). IDL provided Barsalou with a form for the letter (Barsalou Dep. 600). That opinion letter,[3] addressed to IDL, stated that Barsalou had examined various documents in rendering his opinion, including "the Note Pledge Assignment ... by IDL to a lender." The letter represented that "[t]he Partnership is a limited partnership duly organized, validly existing, and in good standing under the laws of the State of Texas." Most important for purposes of this motion, Barsalou stated in the letter:

> This opinion may be relied upon by IDL *and its assignee* under the [Note Purchase] Agreement. (emphasis supplied)

Vereins contends that Barsalou understood that IDL would serve primarily as an arranger of financing, and that a lender bank would subsequently assume IDL's position in the transaction. Such understanding is said to be evidenced in the first above quoted statement by the phrase "by IDL to a lender." Vereins further contends that the last quoted statement from the opinion letter demonstrates that Barsalou expected and intended that IDL's assignee, Vereins,[4] would rely upon the rep-

---

**2.** Pettet was not bonded by Rockwood.

**3.** Insofar as here relevant, the opinion letters issued by Barsalou as to each limited partnership were identical.

**4.** Vereins has presented evidence to establish that Barsalou knew prior to the loan closings that Vereins would be the assignee. Vereins relies upon the following interchange during Barsalou's deposition (at 429):

> Q. Did you ever discuss with anyone other than your counsel the instructions by Vereins of Hamburg to Vereins in New York that the tax returns of the limited partnership be obtained?
> A. I do not believe so.

Defendants argue that Vereins' reading is strained, and point to other portions of the deposition in which Barsalou testified that he was not aware of the identity of Vereins, as well as to Barsalou's affidavit of May 25, 1988 assert-

resentations in the letter. As the Amended Complaint sets forth, Vereins relied upon Barsalou's representation that the partnerships were "duly organized, validly existing, and in good standing under the laws of the State of Texas." It is alleged that this representation carried with it the connotation that the 20% cash capital contributions had been made as required by the private placement memoranda,[5] when in fact—as in the exercise of due care Barsalou should have known—they had not been made, and never were.

## B. *Rockwood*

Rockwood alleges that it relied upon opinion letters sent directly to it by Barsalou. Alternatively, Rockwood alleges that it relied upon the opinion letters sent to IDL, and contends that defendants contemplated Rockwood's reliance because the documentation Barsalou prepared and/or reviewed establishes that he knew both that the transaction contemplated a surety and that Rockwood would be that surety.

In support of the first contention, Rockwood has submitted an affidavit of Robert W. Gerulat, an insurance broker whom the Carter defendants had requested to find an insurer to issue the bonds. Gerulat subsequently contacted Robert E. Eckis, chairman of Payment Plans, Inc., which serves as Rockwood's Managing General Agent. Gerulat avers that at one or more meetings which took place between November 1984 and January 1985, he personally asked Barsalou, on behalf of Rockwood, to provide Rockwood with opinion letters with respect to the three programs which Rockwood bonded (¶¶ 3, 5).

Also before us are three opinion letters addressed to "Rockwood Insurance Company, c/o Mr. Robert B. Eckis, Jr." The first of these (Ex. B to DiSalle Aff.), written on the letterhead of Barsalou and Associates,

P.C., contains the designation "Re: *Splendora Acquisition and Development Program.*" It bears the date of December 1984, with a blank space for the day of the month, and is unsigned. Barsalou testified at his deposition that he believed this opinion letter "was prepared because Mr. Carter requested that it be—that we prepare it." (Barsalou Dep., March 29, 1988 at 282) When asked why the letter was unsigned, Barsalou responded, "I presume that it was never released" (*Id.*). The second and third letters (Ex. C and D to DiSalle Aff.), concerning the Hardin and Arriola programs, are signed by Barsalou but are not written on the firm's letterhead. In all other respects, they are identical to the first opinion letter. Mr. Eckis has given conflicting testimony concerning receipt of these letters. Although Eckis states in an affidavit dated May 3, 1986 that Barsalou provided him with opinion letters prior to the closings of the bonds, he testified at his deposition that he could not remember whether or not he ever received an opinion letter from Mr. Barsalou (Eckis Dep. 32).

The letters addressed to Rockwood are lengthier than the ones addressed to IDL, but contain the same representation that the partnership in question is duly organized and validly existing under Texas law. Eckis testified at his deposition that he also relied upon another statement in the letter to the effect that "the actual offering to the Limited Partners has been completed substantially in the manner described in the Offering Memorandum," which to him meant that the 20% cash component of the limited partners' capital contributions had been paid (Eckis Dep. 56–57).

Alternatively, Rockwood has submitted evidence tending to establish that defendants contemplated Rockwood's participation in the transactions and understood that Rockwood would rely upon the IDL

---

ing that he had no contact with Vereins until well after the closings of the four deals, and was unaware of the existence or identity of Vereins until the spring of 1985 (Barsalou Dep. 397, Aff. ¶ 4). For reasons discussed *infra* at 710, this factual dispute has no bearing on our conclusion.

**5.** Vereins asserts that it construed the representation that the partnership was duly organized and validly existing to mean that the obligations of the limited partners described in the private placement memoranda had been fulfilled—in particular, payment of the 20% cash contributions. On this motion, defendants do not challenge that assertion.

opinion letters. At his deposition, Barsalou testified as to his understanding of the transactions (at 522):

> I understood that there would be a general partner, some limited partners, a lender and a bonding company.

The Note Pledge Assignment from IDL to Vereins, which Barsalou states he examined in formulating his opinion, mentions Rockwood in Paragraph 1: "The undersigned ... assigns ... to the Bank [Vereins] ... the Surety Bond issued by Rockwood Insurance Company." Other documents which Barsalou states he examined in preparation for his opinion letter refer to the surety and the bonds, although without specific reference to Rockwood. For example, the Note Pledge Agreement between IDL and each limited partner recites, "The Bond has been duly and validly issued by the Surety." In addition, the private placement memoranda contain numerous references to the surety and bonds. *See e.g.,* Sections 2.19, 2.27, 2.52, 3.01(b) and 5.01(c). In addition, Gerulat relates in his affidavit that he and Barsalou participated in numerous conversations specifically dealing with Rockwood's financial capacity to act as surety for the Carter oil and gas limited partnership programs, and that he sent Barsalou numerous documents concerning the Rockwood bonds (¶ 4).

## DISCUSSION

■ The threshold question to be considered in deciding this motion is the appropriate choice of law.[6] Vereins, a German bank with a state chartered representative office in New York, contends that New York law applies. Rockwood, which is incorporated in and maintains its principal place of business in Pennsylvania, urges us to apply Pennsylvania law. The Barsalou defendants, Texas lawyers who are not admitted to practice in New York, argue that Texas law governs their professional obligations.[7] In *CrossLand Savings, FSB v.*

*Rockwood Insurance Company,* 692 F. Supp. 1510 (S.D.N.Y.1988) (PNL), a case involving similar facts and some of the same parties, our colleague Judge Leval concluded that New York law should apply. For the reasons outlined in that opinion, we come to the same conclusion. It is undisputed that each of the loan transactions whereby Vereins succeeded IDL's interest closed in New York, and the Note Pledge Assignments between IDL and Vereins were executed there. Moreover, the opinion letter upon which Vereins claims it relied was addressed to IDL, a New York corporation. As to Rockwood, all of the significant activities in connection with issuance of the surety bonds also occurred in New York— it was there that much of the loan negotiation took place, and that Rockwood received Barsalou's opinion letter and determined that it would issue the bonds.

Choice of law having been determined, two questions remain: (a) do the facts alleged by the respective plaintiffs against these defendants establish a basis of liability for negligence in professional conduct under the principles established in *Ultramares Corp. v. Touche* (1931) 255 N.Y. 170, 174 N.E. 441 and its progeny? and (b) under these facts, would the New York Court of Appeals apply those principles to lawyers as well as accountants and other professional persons? For reasons which follow, we believe that both these questions must be answered in the affirmative.

### (a) *Ultramares and its Progeny*

■ In dealing with the extent of liability for acts of negligence to persons not in privity with the actor, New York law views oral or written misrepresentations as distinct from other negligent acts, and has applied a special analysis to the negligent use of words. That distinction was first established by Chief Judge Cardozo's 1931

---

**6.** Federal Jurisdiction is based upon 28 U.S.C. § 1331 and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* Jurisdiction over the state law claim here under discussion (which is, of course, governed by state law) exists pursuant to pendent jurisdiction.

**7.** With the exception of IDL, all defendants are citizens of Texas. We have already granted a default judgment against the Carter defendants.

opinion in *Ultramares, supra.* In that case the New York Court of Appeals was called upon to decide whether an accounting firm could be held liable for negligently preparing a balance sheet which its client subsequently furnished to the plaintiff. Although the defendant accountants knew that their client would exhibit the balance sheet to various persons as a basis for financial dealings, no mention was made of plaintiff or of any other specific party to whom the sheet would be furnished, or of any particular transaction in which it would be used. After reviewing legal developments permitting recovery by non-privity plaintiffs for harm resulting from the release of "a physical force," 255 N.Y. at 181, 174 N.E. 441, the Court raised the question of whether or not a like liability should attach for injury caused by "the circulation of a thought or a release of the explosive power resident in words." *Ibid.* Pointing out that there existed practically no way to predict or limit the number or character of persons who might learn about and rely upon any written or oral statement, the Court concluded that creating an unlimited duty would impermissibly lead to "liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Id.* at 179, 174 N.E. 441.

The Court did not spell out any particular method for limiting this open-ended field of potential liability, but indicated its general approach in the course of restating an earlier Cardozo opinion, *Glanzer v. Shepard* (1922) 233 N.Y. 236, 135 N.E. 275. In *Glanzer,* a public weigher had been held liable in negligence to a purchaser who had not been in privity with it, where the seller had requested the weigher to certify the official weight sheets and furnish a copy to the buyer. In such circumstances, the *Ultramares* court explained, "[t]he bond [between buyer and weigher] was so close as to approach that of privity," and did not expose the defendant to indeterminate liability because "the transmission of the certificate to another was not merely one possibility among many, but the 'end and aim of the transaction.' " *Id.* 255 N.Y. at 182, 174 N.E. 441. The Court went on to observe that in *Glanzer* the services rendered by the weigher had been "primarily for the information of a third person ... and only incidentally for that of the formal promisee." *Ibid.*

The Court's restatement of *Glanzer* thus established the principle that liability for negligent misstatements to one not in contractual privity may attach where the statement is made for the principal purpose of having it relied upon by such person, and where its benefit to the party authorizing the statement stems precisely from such reliance by the third party. We shall refer to this principle as the "*Ultramares* doctrine."

Three years ago, the Court of Appeals, in *Credit Alliance v. Arthur Andersen & Co.* (1985) 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110, revisited and elaborated upon the *Ultramares* doctrine. After a thorough review of applicable authorities—both in New York and elsewhere—it restated the *Ultramares* rule as follows (65 N.Y.2d at 551, 493 N.Y.S.2d at 443, 483 N.E.2d at 118):

> Before accountants may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

It then went on to observe that while "these criteria permit some flexibility in the doctrine" they were "intended to preserve the wisdom of the policy set forth" in *Ultramares* and *Glanzer. Ibid.*

The most recent Court of Appeals application of this doctrine is *William Iselin & Co. v. Mann Judd Landau* (1988) 71 N.Y. 2d 420, 527 N.Y.S.2d 176, 522 N.E.2d 21. There, the non-privity plaintiff (Iselin) was seeking to charge an accountant (Mann) with liability for a misstatement in a report

which the accountant had prepared for a client (Suits) who subsequently obtained credit from Iselin. In explaining why summary judgment properly had been granted to defendant, the Court made the following summary of the facts which plaintiff would have been obligated to establish in order to prevail (71 N.Y.2d at 426, 527 N.Y.S.2d at 178, 522 N.E.2d at 23):

> Iselin was obligated to submit evidence of Mann's awareness that Suits, intending that Iselin would rely on the Reports, would use them for the purpose of procuring credit from Iselin. Beyond that, Iselin was required to show a nexus with Mann from which Mann's understanding of Iselin's reliance could be drawn.

Turning to the matter at hand, assuming *arguendo* that the *Ultramares* doctrine applies to lawyers as well as weighers and accountants, there could be no doubt that the Vereins complaint fits the *Glanzer* holding (as expounded in *Ultramares*) like a glove. As in *Glanzer,* the letters provided by defendants were "primarily for the information of a third person" and only "incidentally"—if at all—for the formal clients. According to Barsalou's deposition testimony, Carter asked him to prepare the letters because IDL sought the lawyer's opinion. Also as in *Glanzer,* Barsalou furnished the letters to a specific party (IDL) pursuant to instructions from his client. Moreover, the opinion letters did not expose Barsalou to liability to "an indeterminate class," but only to the two parties who were specifically authorized to rely on its representations—"IDL and its assignee under the [Note Purchase] Agreement." Nor can there be any question that Vereins has met the burden laid down by the Court in *Iselin.* Barsalou's awareness that a party in Vereins' position would rely on his opinion is provided by his explicit statement, "This opinion may be relied upon by IDL and its assignee under the Agreement."

The only possible question with respect to the application of the doctrine to Vereins would arise in the event a jury should conclude that the identity of the particular assignee, Vereins, was unknown to Barsalou at the time the letter was written. In such event, it might be argued that the person relying on the statement was not a "known party" as required by *Credit Alliance.* 65 N.Y.2d at 551, 493 N.Y.S.2d at 443, 483 N.E.2d at 118. That question is not before us now, as it is not our task on a motion for summary judgment to resolve disputed issues of fact. However, we cannot conceive that the New York Court of Appeals would put any such interpretation on its *Credit Alliance* opinion. As the Court there observed, its intention was not to write a statute, but was rather to lay down guidelines which, with "some flexibility," would capture the "wisdom and policy set forth" in *Ultramares* and *Glanzer.* *Ibid.* That wisdom and policy was designed to protect a defendant from being subjected to liability for "the explosive power resident in words" in lawsuits brought over an "indeterminate time" by the members of "an indeterminate class." 255 N.Y. at 179, 181, 174 N.E. 441. These concerns are well served by limiting liability to the addressee of the opinion letters and the "assignee" whose reliance Barsalou specifically invited, even if the actual identity of the assignee had not been established at the time the letter was written.

With respect to Rockwood, the situation is in some respects more clear and in other respects less so. If, as we must, we view the facts in the light most favorable to Rockwood (the nonmoving party), we must conclude that Barsalou addressed three opinion letters directly to Rockwood, in care of its agent, Eckis. These letters were provided in response to a direct request from Gerulat, another Rockwood agent.[8] If Rockwood is

---

8. Gerulat's precise status is a matter of dispute. Barsalou testified at his deposition that he believed Gerulat to be Rockwood's agent, at least with respect to certain transactions (Barsalou Dep. 376); Eckis stated that Gerulat was not a representative of Rockwood (Eckis Dep. 383). Since we must draw all inferences favorable to Rockwood, this dispute is irrelevant to the question now before us. However, even if it were ultimately to be established that Gerulat was Carter's agent rather than Rockwood's, our conclusion would be unaltered. It makes no difference whether Carter (by his agent) instructed his attorney to provide the opinion letter to

able to establish these facts to the satisfaction of the factfinder, its claim under *Credit Alliance* would be even stronger than that of Vereins. Under the alternative scenario, *i.e.*, if Rockwood relied only upon the IDL letters, the connection between it and defendants would be somewhat less direct. Nonetheless, the circumstances fit well within the parameters of liability outlined in *Credit Alliance*. Barsalou understood that the transactions at issue would involve a surety. Gerulat (who, viewing the facts in the light most favorable to the nonmoving party, must be considered Rockwood's agent) and Barsalou had numerous conversations dealing with Rockwood's ability to act as surety, resulting in various documents being sent from Gerulat to Barsalou concerning the Rockwood bonds. Besides the direct contacts between Gerulat and Barsalou, there is the additional fact that Rockwood is specifically mentioned as the surety in the Note Pledge Assignment executed by IDL, a document which Barsalou admits having reviewed in preparing his opinion letter. Hence, permitting recovery by Rockwood—a party whose participation in the transaction was specifically contemplated by Barsalou—would in no way expand liability to "an indeterminate class."

(b) *The Application of the Ultramares Doctrine to Members of the Legal Profession*

■ The next question we must address is whether or not the *Ultramares* doctrine (as refined in *Credit Alliance*) applies to negligent statements by lawyers. As no one contends that there is a New York Court of Appeals decision squarely in point,

it is our task to predict as best we can what that Court would do were the question presented to it. *Plummer v. Lederle Laboratories* (2d Cir.) 819 F.2d 349, 355, *cert. denied* (1987) —— U.S. ——, 108 S.Ct. 232, 98 L.Ed.2d 191, *citing Meredith v. Winter Haven* (1943) 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9.

We begin our inquiry with the realization that all of the New York Court of Appeals cases (except *Glanzer*) applying the doctrine have been concerned with the liability of accountants.[9] We also note that Judge Leval in his *CrossLand* decision, *supra*, observed (at page 708) that "New York courts have not extended the reasoning of *Credit Alliance* [or—necessarily—of any other decision expounding the *Ultramares* doctrine] beyond its application to accountants."[10] At the time *CrossLand* was decided, there had never been (so far as we have been able to determine) a decision by a New York court sustaining a claim against an attorney based on negligent misstatements where the claim was asserted by a plaintiff having no privity with the defendant. Indeed, there exists a plethora of lower court *dicta* suggesting that no such claim could ever be sustained. However, several weeks after Judge Leval issued his *CrossLand* decision, the Supreme Court of New York County sustained a complaint against a firm of attorneys in circumstances very similar to those at bar based solely on authority of *Credit Alliance*. *Alpert v. Shea Gould Climenko & Casey*, reported in the New York Law Journal, May 27, 1988, p. 23 col. 1.[11] In *Alpert*, plaintiffs invested in a tax shelter

---

Rockwood or whether Rockwood made such request itself; in either event, Barsalou would have been aware that "a known party ... intended to rely" on his statements. *Credit Alliance*, 65 N.Y.2d at 551, 493 N.Y.S.2d at 443, 483 N.E.2d at 118.

**9.** In addition to the Court of Appeals cases cited in the text, we have found three others dealing with liability of accountants: *Westpac Banking Corp. v. Deschamps* (1985) 66 N.Y.2d 16, 494 N.Y.S.2d 848, 484 N.E.2d 1351; *New Castle Siding Co. v. Wolfson* (1984) 63 N.Y.2d 782, 481 N.Y.S.2d 70, 470 N.E.2d 868; *White v. Guarente* (1977) 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315. *See also, Dworman v. Lee* (1st Dept.) 83 A.D.2d 507, 441 N.Y.S.2d 90, *aff'd*

*without opinion* (1982) 56 N.Y.2d 816, 452 N.Y.S.2d 570, 438 N.E.2d 103.

**10.** The Second Circuit made a similar observation in a case involving a claim against an architect. *Widett v. U.S. Fidelity & Guaranty Co.* (2d Cir.1987) 815 F.2d 885, 886–887.

**11.** Judge Cedarbaum of our court has applied the *Credit Alliance* criteria to a negligence complaint against an attorney, but dismissed that complaint because it failed to meet the standards there enumerated. *Grenoble Mills, Inc. v. Drinker, Biddle & Reath* (July 30, 1986) No. 84 Civ. 3514 (MGC), Slip Op. at 5 [available on WESTLAW, 1986 WL 8697].

and deducted certain sums on their tax returns on account of that investment. Plaintiffs alleged that in so doing, they relied on the tax opinions issued by the defendant law firms which, in effect, advised that the Internal Revenue Service would allow those deductions. The Court held:

> Although ordinarily a lawyer owes a fiduciary duty only to a client the lawyer may affirmatively assume a duty to others where, as here, the purpose of a legal opinion is to advise those others and to effect their reliance on such advise [sic] (cf. *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y. S.2d 435, 483 N.E.2d 110] [1985]).

Our own subsequent research has persuaded us that the New York Court of Appeals would agree that the *Ultramares* doctrine is applicable to the legal profession.[12] As discussed below, none of the New York decisions which have been cited to us or which we have found[13] support defendants' position that lawyers are somehow exempt from the reach of the *Ultramares* doctrine.

**12.** *Alpert* in fact goes beyond the *Ultramares* doctrine by imposing upon the attorneys a fiduciary duty rather than one of due care. This motion does not require us to consider whether this extension is justified, nor does it require us to reconsider our holding in *Klein v. Churchill Coal Corp.* (May 5, 1988) 84 Civ. 6509 (WK) [available on WESTLAW, 1988 WL 92114], where we declined to so extend the doctrine. We there observed:

> [W]e ... find plaintiff's reliance on *Credit Alliance v. Arthur Andersen & Co.* (1985) 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110, and *White v. Guarente* (1977) 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315, misplaced. While those cases allow negligence actions by third parties against professionals under certain well-defined circumstances, they nowhere speak of fiduciary liability, which is predicated on a stricter standard of care. The principles enunciated in that line of cases do not support the imposition of fiduciary obligations on these attorneys and accountants in the absence of privity. *Quintel Corp., N.V. v. Citibank, N.A.* (S.D.N.Y.1984) 589 F.Supp. 1235, 1239–42. We therefore dismiss the breach of fiduciary duty claims against all defendants remaining in the case.

*Id.* at 37–38 (footnotes omitted).

**13.** We have reviewed all decisions rendered since 1931 (the year *Ultramares* was decided)

(i) New York Court of Appeals Opinions

No language in any Court of Appeals opinion we have found suggests that the *Ultramares* doctrine was designed exclusively for the accounting profession rather than for application to all professionals dealing with the "explosive power resident in words."[14] In *Credit Alliance* (which did not create but merely applied the doctrine) the Court was dealing with causes of action against two accounting firms and, quite naturally, devoted its opinion to the problems before it. On the other hand, the opinions in *Glanzer* and *Ultramares* (which created the doctrine) range far and wide in describing categories of persons being considered, 233 N.Y. at 239–40, 135 N.E. 275, 255 N.Y. at 182–89, 174 N.E. 441, and specifically mention lawyers as a subject of concern. 233 N.Y. at 240, 135 N.E. 275, 255 N.Y. at 188, 174 N.E. 441. Although the illustrations in those opinions pertaining to lawyers happen to deal with situations in which liability would not attach, there is nothing in either opinion to suggest that, absent problems of confidentiality or privilege, lawyers as a class

dealing with actions against lawyers which have been cited (a) by the parties, (b) by Judge Level in his *CrossLand* opinion (including an A.L.R. article to which he refers), and (c) by Judge Sweet in *Quintel Corp., N.V. v. Citibank, N.A.* (S.D.N.Y.1984) 589 F.Supp. 1235, a thoughtful opinion on this general subject.

**14.** In addition to *Credit Alliance, Iselin,* and the cases listed in footnote 9, *supra,* the *Ultramares* decision has been incidentally cited in the following Court of Appeals opinions, none of which concerns a cause of action based on the negligent use of words: *Waters v. New York City Housing Authority* (1987) 69 N.Y.2d 225, 513 N.Y.S.2d 356, 505 N.E.2d 922 (plaintiff street crime victim who was dragged into public housing sought to charge Housing Authority with liability); *Strauss v. Belle Realty Co.* (1985) 65 N.Y.2d 399, 492 N.Y.S.2d 555, 482 N.E.2d 34 (tenant sought to charge Con Edison with liability for injuries sustained in accident during blackout); *Gobhai v. KLM Royal Dutch Airlines* (1982) 57 N.Y.2d 839, 455 N.Y.S.2d 764, 442 N.E.2d 61 (plaintiff sought to charge airline with liability for injury sustained while wearing airline giveaway slippers at home); *Putnam v. Stout* (1976) 38 N.Y.2d 607, 381 N.Y.S.2d 848, 345 N.E.2d 319 (supermarket customer sought to charge lessor and lessee with liability for injuries sustained in negligently maintained parking lot).

should receive any special treatment in the application of the criteria being discussed.

(ii) Decisions of Lower New York Courts

We have reviewed a multitude of lower court cases decided since the *Ultramares* doctrine was announced [15] and, aside from *Alpert v. Shea Gould, supra,* we have found only two involving an action by a "non-privity" plaintiff against a lawyer based on an alleged negligent misstatement by the latter. In the more recent case, *National Westminster Bank, U.S.A. v. Weksel* (1st. Dept.) 124 A.D.2d 144, 511 N.Y.S.2d 626, *appeal denied* (1987) 70 N.Y. 2d 604, 513 N.E.2d 1307, a bank sued a law firm for negligence in the preparation of certain Securities and Exchange Commission ("SEC") filings upon which the bank had relied in extending a line of credit to the firm's client. While the client had supplied the SEC filings to the bank, there was no allegation that the defendant law firm knew of the client's intention so to use the filings or of the client's purpose in so doing.

The holding of *National Westminster* is in no way inconsistent with plaintiffs' position here. We have before us Barsalou's deposition testimony, which could be interpreted as demonstrating his understanding of the purposes for which his opinion letters would be used. In addition, Barsalou's letters specifically invited Vereins' reliance, and Rockwood has offered evidence that defendants themselves supplied it with the pertinent documents. Thus, Vereins and Rockwood each have presented evidence sufficient to satisfy the three-part test of *Credit Alliance.* By contrast, the facts of *National Westminster* plainly did not meet such standards, since the defendant lawyers in that case had not been alerted to

---

**15.** The following constitute all the lower court decisions that have come to our attention in the course of the research described in footnote 13: *Michalic v. Klat* (2d Dept.1987) 128 A.D.2d 505, 512 N.Y.S.2d 436 (action by former wife against attorney for injuries caused by attorney's representation of her former husband); *Viscardi v. Lerner* (2d Dept.1986) 125 A.D.2d 662, 510 N.Y. S.2d 183 (action by intended beneficiaries against attorney for negligent drafting of a will); *Calamari v. Grace* (2d Dept.1983) 98 A.D.2d 74, 469 N.Y.S.2d 942 (title insurer found not liable to third parties for negligent performance); *Chelsea Marina v. Scoralick* (2d Dept.1983) 94 A.D.2d 189, 463 N.Y.S.2d 489 (landlord's attorney held not liable to evicted tenants for failure to inform sheriff of their motion for reargument or leave to appeal); *Kahn v. Crames* (2d Dept.1983) 92 A.D.2d 634, 459 N.Y.S.2d 941 (sustaining action for conversion by former husband against former wife's attorney); *Baer v. Broder* (2d Dept.1982) 86 A.D.2d 881, 447 N.Y.S. 2d 538 (malpractice action against attorney permitted where widow, though not in privity as individual with attorney, was engaged in face-to-face relationship with defendant as executrix and was one of the real parties in interest and thus a foreseeable beneficiary); *Harder v. McGinn* (3d Dept.) 89 A.D.2d 732, 454 N.Y.S.2d 42, *aff'd* (1982) 58 N.Y.2d 663, 458 N.Y.S.2d 542, 444 N.E.2d 1006 (action by former wife against former husband's attorney for negligent prosecution of a prior claim against another party); *Levine v. Graphic Scanning* (1st Dept.1982) 87 A.D.2d 755, 448 N.Y.S.2d 692 (discussed *infra* at n. 16); *Singer v. Whitman & Ransom* (2d Dept. 1981) 83 A.D.2d 862, 442 N.Y.S.2d 26 (action by stockholder against corporation's counsel for refusal to issue opinion letter); *Gifford v. Harley* (3d Dept.1978) 62 A.D.2d 5, 404 N.Y.S.2d 405 (attorney not liable to third party for error in obtaining default judgment on behalf of client); *Joffe v. Rubenstein* (1st Dept.1965) 24 A.D.2d 752, 263 N.Y.S.2d 867 (bad advice by an attorney to a client does not render the attorney liable to a third party who is affected by client's acts); *Victor v. Goldman* (Sup.Ct. Rockland Co.) 74 Misc.2d 685, 344 N.Y.S.2d 672, *aff'd,* (2d Dept.1973) 43 A.D.2d 1021, 351 N.Y.S.2d 956 (attorney not liable to alleged beneficiary for negligent failure to prepare new will or codicil); *D & C Textile Corp. v. Rudin* (Sup.Ct.N.Y.Co. 1964) 41 Misc.2d 916, 246 N.Y.S.2d 813 (attorneys' advice to clients does not subject them to liability to third persons for inducing breach of contract); *Maneri v. Amodeo* (Sup.Ct.Dutchess Co.1963) 38 Misc.2d 190, 238 N.Y.S.2d 302 (attorney not liable to alleged intended beneficiaries for failure to include a residuary clause in will); *Kasen v. Morrell* (Sup.Ct.Kings Co. 1959) 18 Misc.2d 158, 183 N.Y.S.2d 928 (attorney liable to third party for tortiously inducing client to breach contract); *Dallas v. Fassnacht* (Sup.Ct.N.Y.Co.1943) 42 N.Y.S.2d 415 (third party charge of conspiracy by attorney dismissed for lack of specific factual allegations); *Hakala v. Van Schaick* (City Ct.Bronx Co.1939) 171 Misc. 418, 12 N.Y.S.2d 928 (attorneys not liable to third parties for alleged negligent failure to promptly complete foreclosure against plaintiff's grantee).

Of these opinions, only *Hakala v. Van Schaick* cites *Ultramares* regarding the liability of attorneys to third parties, and that case did not involve a question of reliance on the attorneys' statements. Of the remaining cases, only *Calamari v. Grace* and *Baer v. Broder* incidentally cite *Ultramares* or one of its progeny.

the possibility that the plaintiff bank would rely on their SEC filings in extending credit to the lawyers' client.

Despite the wholly distinguishable facts of *National Westminster*, defendants rely upon the following sweeping dictum from the Court's opinion (124 A.D.2d at 146, 511 N.Y.S.2d at 628):

> It is well-settled that an attorney may not be held liable for negligence in the provision of professional services adversely affecting one with whom the attorney is not in contractual privity (*Calamari v. Grace*, 98 A.D.2d 74, 469 N.Y. S.2d 942; *Levine v. Graphic Scanning*, 87 A.D.2d 755, 448 N.Y.S.2d 692; *cf., Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110).

Several of the other lower court decisions we have reviewed contain similar dicta, which defendants construe as providing immunity from liability to lawyers as a class, regardless of the needs of a given situation. We shall not individually discuss those dicta, as we are quite confident that the New York Court of Appeals would not countenance such a rule.[16] For present purposes, the relevance of the quoted dictum would seem to lie in the fact that by citing *Credit Alliance*, the *National Westminster* court acknowledged that the *Ultramares* doctrine was applicable to the question before it.

In the second case, *Cronin v. Scott* (3d Dept.1980) 78 A.D.2d 745, 432 N.Y.S.2d 656, plaintiffs, who had posted a certificate of deposit as collateral security for a corporate loan on which defendants later defaulted, alleged that the defendant lawyer had negligently misrepresented the financial capabilities of one of the other defendants. Although the facts bear strong resemblance to those at bar, *Cronin* was decided prior to *Credit Alliance*, and the Court was therefore not in a position to consider whether or not the guidelines there announced governed claims against attorneys based upon negligent misstatements.

None of the remaining decisions we have reviewed deal with suits brought by "non-privity" plaintiffs for negligent misrepresentations. They all deal with other types of negligent conduct and are therefore irrelevant to the question before us.[17] In none of those cases was the court asked to decide—as we are here—whether or not the criteria established in *Credit Alliance* apply to lawyers.

We shall briefly mention two cases which seem to us entirely inapposite, but upon which defendants place much reliance. Their reliance upon *Harder v. McGinn* (3d Dept.) 89 A.D.2d 732, 454 N.Y.S.2d 42, *aff'd* (1982) 58 N.Y.2d 663, 458 N.Y.S.2d 542, 444 N.E.2d 1006, is based on the circumstance that it was affirmed by the Court of Appeals. In *Harder*, plaintiff sued an attorney who had represented her former husband in an Article 78 proceeding (in which plaintiff had not been involved)

---

**16.** Moreover, the authorities cited by the *National Westminster* court do not support the broad proposition there asserted. Two of the them did not even concern lawyers: *Calamari v. Grace* (title insurer); *Credit Alliance* (accountants). The third case, *Levine v. Graphic Scanning Corp.*, was an action against attorneys, but the plaintiff did not claim that he had relied upon any oral or written statement made by them. Hence, the *Ultramares* doctrine did not come into play. As far as we have been able to glean from the sparse facts reported, the defendant lawyers in *Levine*, acting as attorneys for a corporation in which plaintiff held stock, gave an opinion that the stock was non-transferable under certain circumstances. That opinion apparently prevented plaintiff from selling his shares. The court held that plaintiff could not recover against the lawyers. This holding has no relevance to the question now before us, and

certainly does not support the *National Westminster* court's sweeping dictum.

**17.** One of those cases, *Schwartz v. Greenfield, Stein and Weisinger* (Sup.Ct. Queens Cty. 1977) 90 Misc.2d 882, 396 N.Y.S.2d 582, has some relevance insofar as it runs counter to defendants' theory that lawyers can never be held liable for negligence to a non-client. The Court there granted judgment against an attorney to a non-privity plaintiff who had lost a security interest due to the attorney's negligent failure properly to perfect the security agreement, as he had agreed to do. The Court pointed out that the transaction was intended primarily for the benefit of the plaintiff, and concluded that an attorney who undertakes a duty to one other than his client is liable for damage caused by the breach of that duty.

which, she alleged, her husband had lost due to the attorney's negligence. Plaintiff claimed to have suffered damage because she was a judgment creditor of her former husband and could not collect since he was judgment proof, a condition she claimed would have been remedied had he won the Article 78 proceeding. Not surprisingly, the Appellate Division dismissed her complaint and the Court of Appeals affirmed. As the *Ultramares* doctrine was wholly inapplicable, neither the Appellate Division nor the Court of Appeals so much as mentioned any of the principles we have discussed, nor cited any case which did so.

Defendants also rely upon *Viscardi v. Lerner* (2d Dept.1986) 125 A.D.2d 662, 510 N.Y.S.2d 183, an action by the intended beneficiaries of a will against an attorney for negligently drafting the will. We find this a puzzling case, in that it seems to suggest that a lawyer drafting a will can never be held accountable for even the most flagrant negligence. However, the case sheds no light on the question of whether or not a third party may recover against a lawyer for a negligent misstatement contained in a document upon which the lawyer intended that party to rely.

In summary, we are aware of no lower court decision which supports defendants' contention that the principles promulgated in *Ultramares* are applicable only to accountants and not to lawyers.

### (iii) Policy Concerns

Defendants argue that public policy concerns counsel against application of the *Ultramares* doctrine to attorneys. Having found no discussion of such concerns in any Court of Appeals opinion, we have combed the various lower court decisions in an attempt to discover whether any court has ever articulated a reason why the principles outlined in *Ultramares* and *Glanzer* should not apply to lawyers. Our search has proved fruitless. However, the concerns expressed by defendants are aptly summarized by Judge Leval in his *Cross-Land* opinion. He there observed (slip op. at 10):

> To the extent that an attorney is held to a duty of care to third parties with whom he is not in a relation of privity, his own interests may conflict with those of his client's. For example, to protect himself from a lawsuit brought by a third party, the attorney may be induced to reveal the confidences of his client or otherwise to act in a manner adverse to his client's interest.

We agree that no claim against an attorney should ever be decided without taking into account the possibility that it might impinge upon either the attorney-client privilege or the attorney's ethical obligation to advocate zealously on behalf of his client. Although the lower courts have been singularly inarticulate as to their reasons for dismissing negligence claims against lawyers, it seems probable that they were motivated by a desire to avoid encroaching upon these foundations of the attorney-client relationship.[18] Here, however, there is no possibility of such encroachment. Barsalou's opinion letters do not constitute advice to a client, but rather were written at the client's express request for use by third parties. In addition, there is no danger of infringing upon Barsalou's zealous advocacy on behalf of his client because the opinion letters were written on his client's instructions. Defendants nonetheless contend that the considerations identified by Judge Leval are implicated because if they are allowed to be sued for misrepresentations made in those letters, they might be compelled to reveal confidential information in defense of such suits. This contention is not persuasive. Since Carter, for his own business purposes, directed his attorney to make representations

---

**18.** For example, had the complaint been sustained in *Michalic v. Klat, supra* n. 15, such a holding would clearly have set a precedent which would have seriously prejudiced subsequent lawyer-client relationships. *Michalic* involved a bitter and protracted custody battle. The mother charged that the lawyer representing the father and his present wife had acted negligently in drawing certain petitions and affidavits, which interfered with the mother's relationship with the children and caused her mental and emotional distress. A lawyer could hardly give wholly disinterested counsel to a client if he had to temper his advice by considerations of how best to limit his own chances of being sued by an unhappy adversary.

716

to Vereins and Rockwood, he must be deemed to have waived any claim of confidentiality as to information necessary to determine the truth or falsity of such representations.

## CONCLUSION

Both Vereins and Rockwood have presented facts bringing their claims squarely within the *Ultramares* doctrine as promulgated by *Ultramares* itself and subsequently refined by *Credit Alliance*. No language in any New York Court of Appeals opinion suggests that lawyers should be excluded from the doctrine's reach, nor does there appear to be any principled reason for such exclusion. As far as we are able to determine, lower New York courts have been faced with the question here presented on only two occasions since the decision in *Credit Alliance* was announced. First, in *National Westminster,* the Appellate Division for the Third Department apparently applied the criteria expounded in *Credit Alliance* and appropriately dismissed the complaint. Second, in *Alpert v. Shea Gould,* the Supreme Court of New York County sustained a complaint against an attorney in express reliance on *Credit Alliance.* Thus, both those decisions indicate, either by implication or directly, that lawyers are not excluded from the principles of liability developed in *Ultramares* and its progeny. We believe that if the instant case were presented to the New York Court of Appeals, it would rule that the Amended Complaint of each plaintiff should be sustained insofar as it charges the defendant lawyers with negligent misstatements.

We accordingly deny the motion of defendants W. Austin Barsalou and Barsalou and Associates, P.C. for partial summary judgment dismissing Vereins' and Rockwood's first cause of action.

SO ORDERED.